UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| VICTORIA LEEVSON, MICHAEL LEIBZON, MATANA ENTERPRISES LLC, KATHERINE TSIGEL VADKAT, INC., VLADISLAV PUSTOV, AND IMPERIAL ENTERPRISE SERVICES INC., <br><br>          Plaintiffs, <br><br>   vs. <br><br> AQUALIFE USA, INC., AQUALIFE, INC., ALEX GITELMAN, YAKOV SIONOV, and VLADIMIR GORBACH, <br><br>          Defendants. | **CASE NO.: 14-cv-6905** |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Robert Bondar (**RB0225**)
LAW OFFICE OF ROBERT BONDAR
28 Dooley Street, 3rd floor
Brooklyn, New York 11235
(347) 462-3262
rbondar@bondarlaw.com

*Attorney for Defendants Aqualife USA, Inc., Aqualife, Inc., Alex Gitelman, Yakov Sionov, And Vladimir Gorbach*

Table of Contents

PRELIMINARY STATEMENT ................................................................ 1

LEGAL STANDARD ........................................................................... 4

ARGUMENT ..................................................................................... 4

I.   PLAINTIFFS' FLSA CLAIMS ARE BARRED BY 2-YEAR STATUTE OF
LIMITATION. ................................................................................... 4

II.   PLAINTIFFS LEEVSON AND TSIGEL LACK STANDING TO ASSERT
FLSA VIOLATIONS BECAUSE THEY WERE NOT EMPLOYEES OF THE
DEFENDANT AQUALIFE; THEY WERE PRINCIPALS AND EMPLOYEES OF
CORPORATE PLAINTIFFS MATANA ENTERPRISES, INC., AND VADKAT
INC., WHICH PROVIDED PAID SERVICES TO AQUALIFE. .................... 9
   a.   Plaintiff Tsigel was a business owner and employee of Vadkat, Vadkat was
   Aqualife's contractor, thus Tsigel has no standing to sue Aqualife under FLSA as
   the employee. ................................................................................ 11
   b.   Plaintiff Leevson was a business owner and employee of Matana, Matana was
   Aqualife's contractor, thus Leevson has no standing to sue Aqualife under FLSA
   as the employee. ............................................................................ 12
   c.   Plaintiffs' statements on their tax returns contradict Plaintiffs' allegations
   that they were employees of Aqualife. ................................................ 14

III.   PLAINTIFFS' CLAIMS FOR BREACH OF CONTRACT SHOULD BE
DISMISSED BECAUSE AQUALIFE FULLY PERFORMED ITS OBLIGATIONS
BY TENDERING PAYMENTS, BY CHECKS, FOR ALL SERVICES RENDERED
BY THE PLAINTIFFS, AND PLAINTIFFS ACCEPTED AND RETAINED SUCH
PAYMENTS WITHOUT ANY OBJECTIONS OR EXPRESSIONS

OF PROTEST. .................................................................................. 18

IV.   PLAINTIFFS' CLAIMS FOR ACCOUNTING SHOULD BE DISMISSED
BECAUSE PLAINTIFFS HAD NO FIDUCIARY RELATIONSHIP WITH
DEFENDANTS AND BECAUSE PLAINTIFFS HAD PLED AN ADEQUATE
REMEDY AT LAW. ........................................................................... 23
   a.   Plaintiffs' claim for an Accounting must be dismissed because Plaintiffs failed
   to plead and establish the existence of a fiduciary relationship and entrustment of
   money or property to the defendants. .................................................. 23
   b.   Plaintiffs have asserted claims for breach of contract, which is an adequate
   remedy at law, and which precludes equitable claims for an accounting. ........... 25

V.   PLAINTIFFS' CLAIMS FOR VIOLATION OF WAGE THEFT
PREVENTION ACT ("WTPA") SHOULD BE DISMISSED BECAUSE
PLAINTIFFS STARTED WORKING BEFORE WTPA TOOK EFFECT AND
PLAINTIFFS WERE NOT EMPLOYEES OF THE DEFENDANT. ................ 26

**VI. DISMISSAL OF PLAINTIFFS' EIGHTH CAUSE OF ACTION IS WARRANTED BECAUSE THERE IS NO EVIDENCE UPON WHICH A REASONABLE FACTFINDER COULD BASE A VERDICT IN THE PLAINTIFFS' FAVOR** ............................................................... 28

**VII. PLAINTIFFS STATE CLAIMS SHOULD BE REMANDED TO STATE COURT IN THE EVENT THAT THE COURT HAS DISMISSED ALL CLAIMS OF ORIGINAL JURISDICTION (FLSA)** ................................................. 33

**CONCLUSION** ........................................................................................ 35

## TABLE OF AUTHORITIES

| Cases: | Pages: |
| --- | --- |
| AIG Europe (Netherlands), N.V. v. UPS Supply Chain Sols., Inc., 765 F.Supp.2d 472 (S.D.N.Y.2011) | 23 |
| Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). | 32 |
| Associated Mortgage Bankers, Inc. v. Calcon Mutual Mortgage LLC, 2016 WL 519659 (EDNY 2016) | 23 |
| Aziz Zarif Shabazz v. Pico, 994 F.Supp. 460, (S.D.N.Y.1998) | 31 |
| Banks v. Correctional Servs. Corp., 475 F.Supp.2d 189 (E.D.N.Y.2007) | 25 |
| Barfield v. N.Y. City Health and Hosps. Corp., 537 F.3d 132 (2d Cir.2008) | 15 |
| Bellefonte Re Ins. Co. v. Argonaut Ins. Co., 757 F.2d 523 (2d Cir.1985) | 6 |
| Breuer v. Jim's Concrete of Brevard, Inc., 538 U.S. 691, 693 (2003) | 17 |
| Brock v. Superior Care, Inc., 840 F.2d 1054 (2d Cir.1988) | 10 |
| Browning v Ceva Frgt., LLC, 885 F. Supp. 2d 590 (E.D.N.Y. 2012) | 10, 15 |
| Browning v. Ceva Freight, LLC, 885 F.Supp.2d 590 (E.D.N.Y 2012) | 15 |
| Conyers v. Rossides, 558 F.3d 137 (2d Cir. 2009) | 17 |
| Copper v. Cavalry Staffing, LLC 132 F.Supp.3d 460 (E.D.N.Y. 2015) | 27 |
| CSI Inv. Partners II, L.P. v. Cendant Corp., 507 F.Supp.2d 384, 425 (S.D.N.Y.2007) | 26 |
| D'Amico v. City of N.Y., 132 F.3d 145 (2d Cir.1998) | 32 |
| D'Amico v. City of New York, 132 F.3d 145 (2d Cir.1998) | 4 |
| Deboissiere v. Am. Mod. Agency 2010 WL 4340642 (E.D.N.Y. 2010) | 10, 15 |
| Doe I v Four Bros. Pizza, Inc., 2013 WL 6083414 (S.D.N.Y. 2013) | 17 |
| Eisenberg v. Advance Relocation & Storage, Inc., 237 F.3d 111(2d Cir. 2000) | 18 |
| Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F.Supp.2d 162 (S.D.N.Y.2011). | 25 |
| Elovich v Schwartz, 1997 WL 452326 (SDNY Aug. 8, 1997) | 19 |
| Faulkner v. Arista Records LLC, 602 F.Supp.2d 470 (S.D.N.Y.2009 | 24 |
| Feigen v. Advance Capital Mgmt. Corp., 150 A.D.2d 281 (1st Dept. 1989) | 24 |

i

Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423 (2d Cir.2001)   32

Gagen v. Kipany Productions, Ltd., 27 A.D.3d 1042 (3rd Dept. 2006)   15

Gate Techs., LLC v. Delphix Capital Markets, LLC, 2013 WL 3455484   25
(S.D.N.Y. 2013)

Gold v. N.Y. Life Ins. Co., 730 F.3d 137 (2d Cir.2013)   27

Greene v. Osterhoudt, 251 A.D.2d 786 (3rd Dep't 1998)   10

Herman v. Mid–Atl. Installation Servs., Inc., 164 F.Supp.2d 667   15
(D.Md.2000)

Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132 (2d Cir.1999).   7

Horn Waterproofing Corp. v. Bushwick Iron & Steel Co., Inc., 66 N.Y.2d   21
321 (1985),

IMG Fragrance Brands, LLC v. Houbigant, Inc., 679 F.Supp.2d 395, 411   24
(S.D.N.Y.2009));

Kastle v. Steibel, 120 A.D.2d 868 (3d Dept. 1986).   24

Kirsch v. Fleet Street, Ltd., 148 F.3d 149 (2d Cir.1998)   10

KJ Roberts & Co. Inc. v. MDC Partners Inc., 2014 WL 1013828, (S.D.N.Y.,   24
2014).

Lande v. Radiology Specialists of Kingston, 806 F.Supp. 1084   20
(S.D.N.Y.1992).

Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc., 87 F.3d 44, 49   24
(2d Cir.1996)

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)   32

May Department Stores Co. v. International Leasing Corp., Inc., 1 F.3d 138   20
(2d Cir.1993).

McLaughlin v. Richland Shoe Co., 486 U.S. 128 (1988),   5

Palazzo v. Palazzo, 121 A.D.2d 261 (1st Dept. 1986)   24

Parada v Banco Indus. De Venezuela, C.A., 753 F3d 62 (2d Cir. 2014),   7

Reich v. Waldbaum, Inc., 52 F.3d 35 (2d Cir.1995)   7

Reuben H. Donnelley Corp. v. Mark I Mktg. Corp., 893 F.Supp. 285   24
(S.D.N.Y.1995)

Rosa v. TCC Commc'ns, Inc., 2016 WL 67729, (S.D.N.Y., 2016)   24

ii

| | |
|---|---|
| Salahuddin v. Goord, 467 F.3d 263 (2d Cir.2006) | 4 |
| Sarbin v. Southwest Media Corporation, 179 A.D. 567 (1st Dep't 1992), | 20 |
| Schmidt v. Tremmel, 1995 WL 6250 (S.D.N.Y. Jan. 6, 1995), | 33 |
| Sellers v. Royal Bank of Canada, 2014 WL 104682 (S.D.N.Y January 8, 2014) | 16 |
| Soley v. Wasserman,  2016 WL 321176 (2d Cir., 2016) | 24 |
| Sony Music Entertainment, Inc. v. Robison, et al., 2002 WL 272406 (S.D.N.Y. 2002) | 24 |
| Trans Sport, Inc. v. Starter Sportswear, Inc., 964 F.2d 186 (2d Cir.1992) | 32 |
| UCC 1-308 (UCC 1-207 before 2004) | 19 |
| Unitel Telecard Distribution Corp. v. Nunez, 90 A.D.3d 568 (1st Dept. 2011) | 24 |
| Young v. Cooper Cameron, 586 F.3d 201 (2d Cir.2009) | 5 |
| Yuquilema v. Manhattan's Hero Corp., 2014 WL 4207106 (S.D.N.Y. 2014), | 27 |

**Statutes:**

| | |
|---|---|
| Fed R. Civ. P. 56(a) | 4 |
| 29 U.S.C. § 255(a) | 1, 5, 6, 7, 8 |
| 29 U.S.C. §§ 203(e)(1), (g). | 10 |
| NYLL § 195(3) | 27 |
| NYLL § 198(1–d) | 27 |
| NYGOL §5-701 | 33 |
| 28 U.S.C. § 1367(c) | 34 |

**Other Authorities:**

| | |
|---|---|
| 19 NYJur.2d Compromise, Accord and Release §§ 26–42 (1987) | 20 |
| N.Y. Sponsors. Memo., 2010 S.B. 8380, 233rd Leg., 2010 Reg. Sess. (Oct. 28, 2010) | 26 |

## PRELIMINARY STATEMENT

Defendants AQUALIFE USA, INC., AQUALIFE, INC., ALEX GITELMAN, YAKOV SIONOV, and VLADIMIR GORBACH, (together, the "Defendants") respectfully submit this memorandum of law in support of their motion pursuant to Rule 56(b) of the Federal Rules of Civil Procedure for summary judgment in their favor dismissing with prejudice the Amended Complaint of the Plaintiffs in this action. The undisputed facts underlying this motion are fully set forth in the Defendants' Rule 56.1 Statement of Undisputed Facts ("St.").

In the First and Second Cause of Action of the Amended Complaint, Plaintiffs Tsigel and Leevson allege that Defendants violated FLSA regulations by failing to pay them hourly wages and for overtime compensation. The applicable Statute of Limitations under 29 U.S.C. § 255(a) bars FLSA claims after two years, defeats Plaintiffs' claims, and supports entry of summary judgment in Defendants' favor.

Plaintiffs Tsigel and Leevson self-categorized themselves as the independent business owners of the corporate Plaintiffs. Tsigel was a W-2 employee of Plaintiff Vadkat and received a small salary from Vadkat. Aqualife paid compensation to the corporate Plaintiffs for the individual Plaintiffs' work at Aqualife. Aqualife issued IRS Forms 1099 (Independent Contractors) to all corporate Plaintiffs for earnings they had received from Aqualife for the work of the individual Plaintiffs. These forms had been retained by all Plaintiffs, without objection, since 2006 until 2012, and all Plaintiffs reported the same earnings on their individual and business tax returns, thereby certifying their accuracy under oath.

1

In 2012, all Plaintiffs abruptly left Aqualife to form a competing company. Aqualife asserted their rights against these Plaintiffs under the non-compete agreements in a breach of contract claims commenced in NY Supreme Court, which claims were dismissed on summary judgment, and the appeal currently pending in the Second Department. Around the same time Plaintiffs instituted a defamation suit in New Jersey against Aqualife's owners, which was dismissed with prejudice, and this instant action.

Until their termination from Aqualife, and until Plaintiffs instituted this lawsuit in 2014, Plaintiffs had never objected in writing to their categorization as the independent contractors of Aqualife, or demanded overtime pay. Plaintiffs received commissions for sales and hourly pay for office services, which Plaintiff Tsigel herself admitted was about "50 percent" of her total time working at Aqualife. Ex. 13, p.89-90. Thus, according to the Amended Complaint, since the agreed-upon hourly wage to Tsigel was $10 per hour, well-exceeding FLSA Minimum Wage regulation[1], and she was not entitled to overtime pay in any case, as by her own admission, she only performed office work no more than 31.5 hours per week, Ex. 4, ¶32, 57, it disqualifies Tsigel from coverage under FLSA as a matter of law.

Plaintiff Leevson received commissions and hourly wages, all of which were paid to her company Plaintiff Matana, for overseeing and supervision of the sales made by the technical department of Aqualife. According to Leevson, her hourly wages were $10 per hour for resolutions of customers' complaints and managing technicians' schedules, but she would receive commissions for solicitation of customers and sales made by the department, which she managed and supervised. Ex. 4, ¶21, 22, 24. As a result, any reasonable fact-finder must conclude that Leevson was never Aqualife's employee

---

[1] $7.25 per hour as of 2009. https://www.dol.gov/whd/minimumwage.htm
[2] "A party's assertion of fact in a pleading is a judicial admission by which it is normally bound

entitled to FLSA protections, but a self-employed business owner, who collected significant compensation and enjoyed tremendous tax breaks bestowed upon her as a result of this position.

Remaining Plaintiffs' state claims, over which this Court has supplemental jurisdiction, should be dismissed or remanded to the state court for resolution and trial. Plaintiffs' Claim for Accounting must be dismissed because Plaintiffs failed to plead and establish that they had a fiduciary relationship with the Defendants or that the Plaintiffs entrusted the Defendants with any money or property. Similarly, Plaintiffs' claims of breach of contract complaining that they were underpaid commissions by Aqualife are precluded by UCC 1–207 (as adopted in New York) in that they had waived any objections or disputes they might have had with the amount of their commissions by failing to preserve these objections in writing, by stating "under protest" on the copies of the checks, which they had all signed signifying receipt thereof, as demanded by the Defendants.

Although Plaintiff Tsigel claims that Aqualife never paid her the agreed-upon hourly wages and overtime pay from 2009 to 2012, Aqualife in response produced copies of her bank checks for 2011, evidencing that payments of commissions and payments of the hourly wages were issued to Tsigel on separate checks, and distributed on different dates - with the hourly wages always being paid on Mondays. Aqualife presented Affidavits of its former workers, who attest to receiving checks for hourly wages at the same time that Tsigel received hers, and Tsigel's prepared statements to Americhoice, which state that she received $450 per week in salary. Sheer implausibility of Tsigel's claims that she had worked without any promised pay for six years must draw an

3

inescapable conclusion of any reasonable fact-finder that Plaintiffs' claims are fanciful at

best, with a complete lack of any supporting evidence in the record, which make

rendering a verdict for Tsigel virtually impossible.

Accordingly, since Plaintiffs have no viable claims against the Defendants under

FLSA, WTPA, for breaches of contract, or for accounting, the Defendants are entitled to

summary judgment as a matter of law.

## LEGAL STANDARD

Summary judgment should be granted if "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P.

56(a). "Rule 56(c) provides that the trial judge shall then grant summary judgment if

there is no genuine issue as to any material fact and if the moving party is entitled to

judgment as a matter of law."); Salahuddin v. Goord, 467 F.3d 263 (2d Cir.2006)

("Summary judgment is appropriate where there exists no genuine issue of material fact

and based on the undisputed facts, the moving party is entitled to judgment as a matter of

law.") (quoting D'Amico v. City of New York, 132 F.3d 145 (2d Cir.1998).

## ARGUMENT

**I.     PLAINTIFFS' FLSA CLAIMS ARE BARRED BY 2-YEAR STATUTE OF
LIMITATION.**

Plaintiffs First and Second Causes of Action of the Amended Complaint entitled

"Violation of FLSA", which allege FLSA violations in connection with Plaintiffs'

Leevson and Tsigel's work at Aqualife, should be dismissed, as these claims are barred by the applicable statute of limitations.

Under the Fair Labor Standards Act (FLSA), Plaintiffs must file the lawsuit within two years of the date of the employer's wage violation, *see* 29 U.S.C. § 255(a), and are only allowed to recover unpaid wages, overtime, and liquidated damages for the two years prior to filing the claim, except if there is a finding that the violation was willful, in which case a three-year statute of limitations applies. Id.

To establish willfulness for the purposes of extending the limitations period, employee must prove by substantial evidence that the employer knew it was in violation of the Act or acted in reckless disregard as to whether it was in violation of the Act. *See* McLaughlin v. Richland Shoe Co., 486 U.S. 128 (1988), Young v. Cooper Cameron, 586 F.3d 201 (2d Cir.2009) (applying McLaughlin "willfulness" standard). However, mere negligence on the part of the employer is insufficient. Young, 586 F.3d at 207. If an employer acts reasonably in determining its legal obligation, its actions cannot be deemed willful. Id.

Plaintiffs commenced the instant action on November 24, 2014 by delivering a copy of the original Complaint, Ex. 1, Notice of Lawsuit, and Request for Waiver of Service of Summons, Ex. 2, to Defendant Alexander Gitelman. Defendants consented to such Waiver by their undersigned counsel on December 2, 2014, Ex. 3. According to the Complaint, Defendants terminated Plaintiff Leevson on July 23, 2012. Ex. 1, ¶25. Likewise, Plaintiff Katherine Tsigel "quit her position on November 9, 2012." Ex. 1, ¶ 32. Thus, according to Plaintiffs' own Complaint allegations, to which they are bound as

a judicial admission,[2] the statute of limitations to commence First and Second Causes of Action expired on July 23, 2014, and November 9, 2014, respectively. Under 29 U.S.C. § 255(a), plaintiffs may only recover unpaid wages for the two years prior to filing the FLSA claim. Because Plaintiffs filed their FLSA claims more than two years following their termination from Aqualife, they are now time-barred under the limitations period. ¶

In the Complaint, Plaintiffs allege that Defendants violations were willful, thus attempting to extend the statute to three years. Ex. 1, ¶ 26-32. Other than these completely conclusory allegations, Plaintiffs completely failed to adduce any evidence whatsoever, that Defendants "were fully aware of their legal obligation to pay hourly and overtime wages" to Plaintiffs Leevson and Tsigel, and "knowingly and willfully chose to ignore their obligations." Ex. 1, at ¶26-28.

To the contrary, Defendant's corporate accountant testified that he never discussed with the principals of Defendant Aqualife the requirements to pay overtime to the employees, because the only employees at Aqualife were the principals. Ex. 12 at p.40-44. The accountant also testified, that Defendant Aqualife was investigated by the IRS, in connection to a potential misclassification of the worker as 1099 rather than W-2 employee, and that Aqualife was found to have acted properly. Ex. 12 at p.49-50, Ex. 30. Considering the advice provided by the corporate accountant, the results of the prior IRS inquiry, and a complete lack of any other similar FLSA claims by any other workers of Aqualife at any time prior to, or during the Plaintiffs' engagement there, it cannot be seriously argued that Defendants acted with the requisite guilty knowledge or with the reckless disregard of the Act.

---

[2] "A party's assertion of fact in a pleading is a judicial admission by which it is normally bound throughout the course of the proceeding." Bellefonte Re Ins. Co. v. Argonaut Ins. Co., 757 F.2d 523 (2d Cir.1985)

At all times, during their engagement with Aqualife, individual Plaintiffs Leevson and Tsigel were the employees and owners of the corporate Plaintiffs, Matana Enterprises, Inc. and Vadkat, Inc., respectively, and they never had any individual relationship with Aqualife. Aqualife retained the services of the corporate Plaintiffs, and at all times relevant hereto paid all compensation due to the individual Plaintiffs to their companies. Plaintiffs' at all times acquiesced to their employment status, as demonstrated by Plaintiffs' own sworn statements made under the penalty of perjury in their corporate and individual tax returns, Ex. 5, 6, 7, 8. At no time during their engagement, did the Plaintiffs ever object to being "misclassified", or asserted their entitlement to FLSA privileges, or ever demanded their unpaid hourly and overtime wages in writing. There is a complete lack of any documentary evidence in the record, which may even remotely establish that Defendants acted unreasonably, let alone recklessly, in classifying Leevson and Tsigel as the independent contractors, providing services to Aqualife through their respective business entities, and compensated accordingly for such services. "[T]o prove a willful violation of the FLSA within the meaning of § 255(a), it must be established that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." Reich v. Waldbaum, Inc., 52 F.3d 35 (2d Cir.1995). Even "[i]f an employer acts unreasonably, but not recklessly, in determining its legal obligation, its action should not be considered willful." Id.

The "plaintiff bears the burden of proof" on the issue of willfulness for statute of limitations purposes. Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132 (2d Cir.1999). In Parada v Banco Indus. De Venezuela, C.A., 753 F3d 62 (2d Cir. 2014), the court granted Defendant's summary judgment motion under very similar circumstances, holding that

7

Employer's mistaken classification of employee as exempt under FLSA from overtime pay requirements was not willful, as required to trigger three-year statute of limitations, because the employee "failed to adduce any evidence regarding how misclassification occurred", *citing* Fair Labor Standards Act of 1938, § 6(d)(2)(A).

Nothing prevented Plaintiffs from filing their FLSA claims timely. Plaintiff Leevson attempted to lodge a complaint with New York's Department of Labor ('DOL'), only to be rejected. Ex. 11, Ex. 14, p.180-184. By asking the DOL to review her claim in September 2014, still within the two-year statute of limitations, as well as by commencing another lawsuit against Aqualife in New Jersey for defamation and emotional distress, Ex. 17, Plaintiff Leevson showed that she was capable of taking legal action much earlier. There was absolutely no impediment for either Plaintiff to commence this action at or near the time of their termination from Aqualife. It is clear that the instant action was commenced for improper strategic reasons, and in retaliation for the lawsuit that Aqualife commenced against Leevson, Leibzon, and Pustov in 2013 in New York Supreme Court for their breaches of the non-compete agreements. Ex. 18.

The Plaintiffs had failed to make any showing of "willfulness" on the part of Aqualife, in order to credibly assert the existence of any triable issue of fact on this issue. As there is no evidence in the record to permit the jury to find that Defendants acted willfully or recklessly, the Court should, as a matter of law, grant the Defendants' summary judgment motion dismissing First and Second Causes of Action of the Amended Complaint as time-barred under 29 U.S.C. § 255(a).

## II.   PLAINTIFFS LEEVSON AND TSIGEL LACK STANDING TO ASSERT FLSA VIOLATIONS BECAUSE THEY WERE NOT EMPLOYEES OF THE DEFENDANT AQUALIFE; THEY WERE PRINCIPALS AND EMPLOYEES OF CORPORATE PLAINTIFFS MATANA ENTERPRISES, INC., AND VADKAT INC., WHICH PROVIDED PAID SERVICES TO AQUALIFE.

As indicated in the Defendants' Statement of Undisputed Material Facts, throughout their professional relationship with Aqualife, Plaintiffs Leevson and Tsigel, were the principals and employees of the corporate Plaintiffs, Matana Enterprises, LLC, ('Matana') and Vadkat, Inc., ('Vadkat'), respectively. Plaintiffs Leevson and Tsigel had never worked for Aqualife in their individual capacity and Aqualife never paid any compensation to Plaintiffs Leevson and Tsigel individually. While Leevson and Tsigel incredibly assert that they had never been compensated by Aqualife for their hourly work[3], which Aqualife disputes, it is true that all compensation, including commissions and hourly wages, due for Leevson and Tsigel's work for Aqualife, were always paid only to the corporate Plaintiffs Vadkat and Matana.

Matana and Vadkat compensated Leevson and Tsigel for their work at Aqualife from the earnings that Matana and Vadkat collected from Aqualife and deducted substantial business expenses from their corporate earnings. It follows then, that Leevson and Tsigel themselves never considered to be the employees of Aqualife, until this lawsuit was commenced two years after their termination.

At all times relevant hereto, Aqualife paid all compensation for all services provided by the individual Plaintiffs to their respective businesses - the corporate Plaintiffs in this action. It was a three-tiered relationship: Aqualife paid compensation to the individual Plaintiffs' corporations, which paid the individual Plaintiffs, who were

---

[3] Tsigel claims that Aqualife had not paid her hourly wages for six years of working; Leevson claims only one.

9

employees of the corporate Plaintiffs. Legally, Aqualife had no direct relationship to the individual Plaintiffs at all, only with the corporate Plaintiffs. As such, FLSA does not apply to Plaintiffs Leevson and Tsigel for their work at Aqualife, because Leevson and Tsigel were in business for themselves - providing Aqualife with services through their incorporated businesses. Accordingly, Leevson and Tsigel were never Aqualife's employees.

The threshold legal issue that forms the core of the summary judgment motion is whether the Plaintiffs were properly qualified under FLSA as independent contractors or employees. *See* Deboissiere v. Am. Mod. Agency, No. 09 Civ. 2316, 2010 WL 4340642, (E.D.N.Y. 2010) FLSA labor laws apply only to employees, not independent contractors. Independent contractors are not covered by the FLSA. 29 U.S.C. §§ 203(e)(1), (g). The determination of this issue depends largely on the circumstances of the individual case, however where "evidence is undisputed, and the facts are compellingly clear, the issue may be determined as a matter of law." Browning v Ceva Frgt., LLC, 885 F. Supp. 2d 590 (E.D.N.Y. 2012) *quoting* Greene v. Osterhoudt, 251 A.D.2d 786 (3rd Dep't 1998).

The Second Circuit explored this precise issue in Kirsch v. Fleet Street, Ltd., 148 F.3d 149 (2d Cir.1998). The court explained that in a previous case, it "discussed factors to be considered in determining whether a person was an employee or an independent contractor in light of the totality of the circumstances, and ... noted that the 'existence and degree of each factor is a question of fact while the legal conclusion to be drawn from those facts—whether workers are employees or independent contractors—is a **question of law**.' " Id., *quoting* Brock v. Superior Care, Inc., 840 F.2d 1054, 1059 (2d Cir.1988) (*emphasis added*), thus appropriate for determination on a summary judgment motion.

a.    **Plaintiff Tsigel was a business owner and employee of Vadkat, Vadkat was Aqualife's contractor, thus Tsigel has no standing to sue Aqualife under FLSA as the employee.**

Plaintiff Tsigel admitted that she was a principal of Vadkat since 2006, Ex. 4, ¶7, Ex. 13, p.45-46, 49. Aqualife paid Vadkat for all work that Tsigel and her husband, Vadim, did at Aqualife. Ex. 13, p.53-58. According to Form 1099 issued by Aqualife to Vadkat in 2011, the only year of Tsigel's possible FLSA eligibility[4], Vadkat received $126,512 for Tsigel and her husband Vadim's work at Aqualife. Ex. 28. Corporate tax return for Vadkat in 2011, lists same $126,512 as its Gross Receipts for the year, Ex. 7, indicating that in 2011,Vadkat received all its compensation from Aqualife. From this amount, Vadkat paid its officers and employees a total sum of $26,000, in salaries and wages, Ex. 7, p.1, while everything else was deducted as Vadkat's business expense.

According to Tsigel's sworn[5] individual tax returns for 2011, this $26,000 in total compensation was split between Tsigel and her husband Vadim: $20,000 to Tsigel, and $6,000 to Vadim. Ex. 6, p.11 ('Summary of W-2 Statements'). Tsigel[6] also listed $8,960 as her business income, describing her business or profession as "Commission Sales". Ex. 6, p.12-13. As for her occupation, Tsigel listed it as a "salesperson", rather than an "office manager", which is what she alleged in the Amended Complaint, Ex. 4, ¶31.

At no time during her engagement was Tsigel paid directly by Aqualife, instead her commissions were paid to Vadkat, Ex. 13, p.53-54, and she admitted Aqualife had never paid her individually. Ex. 13, p.29, 38, 39. In 2012, Vadkat issued W-2 form to

---

[4] See *Statute of Limitations* and *Willfulness* Section of the instant Brief.

[5] Tsigel's individual 2011 tax return contains statements above the signature line that "under penalties of perjury", the taxpayer had examined the return and declared it to be "true, correct, and complete".

[6] Tsigel submitted Affidavit that she produced copies of her 2010-2012 personal tax returns.

11

Tsigel, Ex. 19, which establishes beyond doubt that Tsigel was employed by Vadkat, when she was working at Aqualife. Thus, since Tsigel clearly was not employed by Aqualife, but was instead the owner and employee of Vadkat, she is not entitled to FLSA protections and lacks standing to assert FLSA claims against Aqualife.

**b.     Plaintiff Leevson was a business owner and employee of Matana, Matana was Aqualife's contractor, thus Leevson has no standing to sue Aqualife under FLSA as the employee.**

Aqualife hired Plaintiff Leevson as the dealer of its products for off-premises sales on April 29, 2009. Prior to starting work, Leevson signed Independent Business Owner (IBO) Contract, Ex. 20, which expressly states in  1 – "..I as IBO agree and acknowledge … the following: 1.) <u>IBO is not Aqualife Inc.'s employee</u> or representative but an independent legal person..". (emphasis added). On the same date, Leevson executed IRS Form W-9, Ex. 29, certifying that she is not "subject to backup withholding", clearly alluding to her non-employee status. At her deposition, Leevson admitted signing the IBO agreement with Aqualife, and being retained by Aqualife as the independent business owner. Ex. 14, p.43. Leevson testified that as an independent business owner, she was responsible for her own expenses in connections with services that she provided to Aqualife. Ex. 14, p.49. Theses expenses were deducted from Matana's tax returns at significant rates.

At all times, Leevson worked at Aqualife through Matana, of which she was a principal, owning 5% of Matana. Ex. 4, ¶4, Ex. 14, p.108-09. Aqualife had never paid any compensation, including hourly wages, to Leevson directly. Ex. 14, p.177-78.

Instead, all payments by Aqualife for services provided by Leevson were paid only to Matana. Ex. 14, p.62.

According to Form 1099, issued by Aqualife to Matana in 2011, the only year of Leevson's possible FLSA eligibility[7], Ex. 27, Matana received $93,908, for Leevson and Leibzon's work at Aqualife. On the 2011 corporate tax return for Matana, the same amount is listed as Gross Receipts, Ex. 9, indicating that in 2011, Matana received compensation only from Aqualife. In 2011, Matana claimed deductions of 75% of its gross income as business expenses, which included rental expenses, advertising, car expenses, and meals and entertainment – all which deductions are not permissible for W-2 employees to take.

While, unlike Vadkat, Matana did not pay any salary to its employees in 2011, Matana nevertheless compensated Leevson by increasing her capital account amount. Schedule K-1 contained in Matana's 2011 corporate tax return indicated the increase in Leevson's capital account of $1,195. Ex. 9, p.25. The same $1,195 is listed on Leevson's individual tax returns for 2011, as income from Matana on Schedule E. Ex. 8, p.3, 5.

According to Leevson's own sworn[8] to individual tax returns for 2011, she listed her occupation as "Sales", Ex. 8, p. 3, rather than a "sales manager", which is what she had alleged in the Amended Complaint, Ex. 4, p.21, and which she categorically denied during her deposition. Ex. 14, p.81. Leevson stated that her position had no name, and that she would sometimes lie when she was on the phone, calling herself either a "partner

---

[7] See Section on *Statute of Limitations* and *Willfulness* in the instant Brief

[8] Individual 2011 tax return contains statements above the signature line that "under penalties of perjury", the taxpayer had examined the return and declares it to be "true, correct, and complete". Ex. 8.

in the company" or a "secretary", depending on the situation and in order to be paid. Ex. 14, p.78, 165.

There is no absolutely no evidence in the record, that at any time prior to filing

At no time between 2008-12, during her relationship with Aqualife, did Leevson ever claim she was Aqualife's W-2 employee on her tax returns or anywhere else. At no time did Leevson attempt backup withholding of taxes from any portion of her compensation from Aqualife or Matana, or have FICA, Social Security, unemployment, and other state and federal income taxes deducted from her compensation, as is the case with W-2 employees. Notably, Leevson admitted at her deposition that "I never work for somebody. I always owned my own business." Ex. 14, p.18.

There is no absolutely no evidence in the record, that at any time prior to filing the instant lawsuit in 2014, Leevson ever considered herself W-2 employee of Aqualife, or that she was hired as W-2 employee by Aqualife, or that Aqualife ever paid her anything directly, either as to its employee or independent contractor. At all times, Leevson acquiesced to all payments for her work paid to Matana and continued to work on the same terms and conditions until she left Aqualife. By her own admissions, Leevson  clearly is not entitled to FLSA protections for any work that she did at Aqualife, because at all times she was a business owner of Matana, which provided contractors' services to Aqualife.

**c.      Plaintiffs' statements on their tax returns contradict Plaintiffs' allegations that they were employees of Aqualife**

New York courts have long noted that it is a "significant consideration" if the person classifies himself or herself as an independent contractor for income tax purposes. Browning v. Ceva Freight, LLC, 885 F.Supp.2d 590 (E.D.N.Y 2012), *citing* Gagen v.

14

Kipany Productions, Ltd., 27 A.D.3d 1042 (3rd Dept. 2006). In Browning, the Plaintiffs "all sought significant tax benefits associated with their independent contractor status", which the court took into serious consideration. "Indeed, though not quite rising to the level of estoppel, if a plaintiff signs a tax return "under penalty of perjury" that declares independent contractor status and seeks "numerous deductions for business purposes associated with independent contractor status, such as travel, entertainment, lodging, supplies, telephone and depreciation of business assets," such a tax return may significantly impede the plaintiff's ability to claim employee status for purposes of filing an overtime or minimum wage claim." Browning v. Ceva Freight, LLC, at 605, Deboissiere v. Am. Mod. Agency, No. 09 Civ. 2316, 2010 WL 4340642 (E.D.N.Y. Oct. 22,2010) *quoting* Gagen.

Federal courts use the "economic realities test" for the inquiry of whether one qualifies as an employee or independent contractor. However, "the court is also free to look at any other relevant factors under the totality of the circumstances, based on the individual facts of the case". Barfield v. N.Y. City Health and Hosps. Corp., 537 F.3d 132 (2d Cir.2008) (explaining that a worker's status as an employee or independent contractor under the FLSA is "a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances ....") Browning, at 607.

"It is important whether the Plaintiffs made substantial investments in their businesses. If they utilized their own vehicles and all of their own tools and supplies, that would support a finding of independent contractor status." See, e.g., Herman v. Mid–Atl. Installation Servs., Inc., 164 F.Supp.2d 667, 675 (D.Md.2000) ("The Installers are responsible for providing their own truck or van and specialty tools ... Because these

costs are considerable, especially considering the expense of a truck or van, and are of a type not normally borne by employees, this factor indicates that the Installers are contractors.")

Here, as set forth above, in 2011 Plaintiff Vadkat deducted $126,670 in Deductions from $126,513 in gross income - leaving Vadkat with **0** tax liability. Of $126,670 in Deductions, Vadkat declared only $26,000 in salary and officer compensation, $15,362 in "taxes and licenses", and a whopping $80,362 for the "other deductions", which include vehicle expenses, meals and entertainment, leasing expenses, tools and supplies, and $32,321 for phantom "outside services". Ex. 7.

Likewise, in 2011 Matana received $93,908 in gross income from Aqualife, paid no wages or compensation to its owners, but it still deducted $70,013 in business expenses, which included $4,800 for advertising, $21,216 in auto expenses, $18,560 for "outside professional services", and $12,000 for rental expenses. The fact that "plaintiff certified to the government on his tax returns that he operated as a non-employee, enabling him to receive deductions otherwise unavailable to employees, weighs in favor of finding him to be a contractor." Sellers v. Royal Bank of Canada, 2014 WL 104682 (S.D.N.Y January 8, 2014). Matana and Vadkat's deductions weigh heavily in favor of finding them to be the independent contractors, rather than employees of Aqualife.

In 2011, Vadkat's deductions equaled more than 100% of its gross income, while Matana deducted "only" 75%. Clearly, Plaintiffs sought and received "significant tax benefits associated with their independent contractor status", which the Court should take into serious consideration, in accordance with Browning, Deboissiere, and Sellers.

16

The Court should also consider Plaintiffs' sworn statements in their tax returns in its initial determination, whether the Plaintiffs had even met their burden of the existence of the employer-employee relationship between them and Aqualife for the purposes of FLSA. It is a jurisdictional question. "Having determined the FLSA's employment-relationship requirement is jurisdictional, the Court must decide whether plaintiffs have met their burden to establish an employment relationship. <u>Doe I v Four Bros. Pizza, Inc.,</u> 2013 WL 6083414 (S.D.N.Y. 2013), *citing* <u>Conyers v. Rossides,</u> 558 F.3d 137 (2d Cir. 2009). If the Court finds that the Plaintiffs failed to meet their burden, then the Court would be divested of the subject matter jurisdiction over Plaintiffs' FLSA claims, and the Plaintiffs would thus lack standing to sue under FLSA,[9] *see* <u>Doe I v Four Bros. Pizza, Inc.</u>

Defendants did not withhold payroll or any other employment-related taxes from the individual Plaintiffs' hourly wages. Aqualife never issued W–2 forms to the individual Plaintiffs and there is no evidence anywhere in the record that the individual Plaintiffs ever requested, demanded, or even suggested, that they should be treated as Aqualife's employees. Aqualife's treatment of the individual Plaintiffs, and their voluntary acceptance of independent contractor status, also weighs significantly in favor that Plaintiffs' were properly categorized as incorporated workers and independent

---

[9] Although it has not addressed the precise issue here, the Supreme Court has recognized that Section 216(b) establishes the jurisdiction of the federal courts over FLSA actions. *See Breuer v. Jim's Concrete of Brevard, Inc.,* 538 U.S. 691, 693 (2003) ("The FLSA provides that an action 'may be maintained ... in any Federal or State court of competent jurisdiction.' "). Unlike in *Arbaugh,* the FLSA's employer-relationship language appears in a statutory provision that plainly "speak[s] in jurisdictional terms," by addressing the jurisdiction of the federal courts to hear claims arising under the FLSA. *See Li v. Renewable Energy Solutions, Inc.,* 2012 WL 589567; see also *White v. Classic Dining Acquisition Corp.,* 2012 WL 1252589, (S.D.Ind. Apr. 13, 2012) ("**[T]he wording of [Section 216(b) ] makes it clear that standing to pursue an action for employer liability is limited to employees only.... In other words, liability under the FLSA is predicated upon an employer-employee relationship.**"). (emphasis added)

17

contractors by Aqualife. "Plaintiff's tax treatment by defendants signifies that he was in fact an independent contractor." <u>Eisenberg v. Advance Relocation & Storage, Inc.</u>, 237 F.3d 111(2d Cir. 2000).

From the foregoing, it is clear that neither Aqualife nor the Plaintiffs themselves ever considered Tsigel and Leevson to be the employees of Aqualife. From 2008, Plaintiffs enjoyed significant tax benefits and deductions associated with their declared tax status. For those reasons alone, Plaintiffs' FLSA claims, contained in the First and Second Causes of Action in the Amended Complaint, should be dismissed.

**III.   PLAINTIFFS' CLAIMS FOR BREACH OF CONTRACT SHOULD BE DISMISSED BECAUSE AQUALIFE FULLY PERFORMED ITS OBLIGATIONS BY TENDERING PAYMENTS, BY CHECKS, FOR ALL SERVICES RENDERED BY THE PLAINTIFFS, AND PLAINTIFFS ACCEPTED AND RETAINED SUCH PAYMENTS WITHOUT ANY OBJECTIONS OR EXPRESSIONS OF PROTEST.**

Plaintiffs' claims for breach of contract contained in the Fourth, Fifth, Sixth, and Ninth Causes of Action must be dismissed because it is undisputed that Aqualife tendered payments of commissions to Plaintiffs by checks for services that Plaintiffs performed for Aqualife, and that Plaintiffs accepted and deposited Aqualife's checks without any protestations or objections. By accepting these payments, Plaintiffs are deemed to have accepted Aqualife's payments in full satisfaction of Aqualife's obligations to pay and waived all claims for unpaid compensation as a matter of law.

From 2008 to 2012, Aqualife made payments of commissions to Plaintiffs by checks. Aqualife requested that Plaintiffs sign a statement of commissions provided by Aqualife along with the checks, and/or the copy of the check, contemporaneously with tendering payments, to indicate that the payments by checks were received and accepted. Ex. 15, p.91, <u>Decl. Sionov</u>. At no time, did any of the Plaintiffs ever object in writing, by

18

writing "under protest", or "without prejudice", or any other similar expressions of

dispute and disagreement upon any of these checks and statements, to the amounts they

were paid. Ex. 13, p. 43, 109, Ex.15, p. 99, 109, Ex. 16, p. 83-85.

Having had ample opportunity to write about their dissatisfaction, that "not all

such commissions – duly earned and owing – have been paid by Defendants", Ex. 4,

neither Plaintiff had ever issued such a writing, on the checks or on the accompanying

statements. In fact, Plaintiffs had never issued this type of written disagreement, or any

other, during their six or more years of working for Aqualife, while they collected hefty

commission checks. Plaintiffs bring this action two years after they left Aqualife, to form

a competing company, and brazenly assert that they are owed hundreds of thousands of

dollars[10], which Aqualife allegedly underpaid them in commissions. However, since

Plaintiffs had never expressed their dissatisfaction in writing, contemporaneously with

receiving their commission checks from Aqualife, their claims of underpayment are

precluded by UCC 1-308[11] (UCC 1-207 before 2004), and by the common law rule of the

"accord and satisfaction".[12]

In Elovich v Schwartz, 1997 WL 452326 (SDNY Aug. 8, 1997), the court aptly

described this rule and the UCC provision, which later stemmed from it: "**The**

**acceptance of a check in full settlement of a disputed unliquidated claim without**

**reservation operates as an accord and satisfaction discharging the claim** since the

---

[10] Except Plaintiff Leevson, who alleges monetary damages of $1,000,000, in the Ninth Cause of Action, for one-year of working. Exh. 4 at 21, 22.
[11] UCC 1-308. Performance or Acceptance Under Reservation of Rights.
 (a) A party that with explicit reservation of rights performs or promises performance or assents to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved. Such words as "without prejudice," "under protest," or the like are sufficient.
(b) Subsection (a) does not apply to an accord and satisfaction.
[12] Pled by Defendants as Tenth Affirmative Defense. Ex. 2 – Second Amended Answer.

theory underlying the common law rule of accord and satisfaction is that the parties have entered into a new contract discharging all or part of their obligations under the original contract. Lande v. Radiology Specialists of Kingston, 806 F.Supp. 1084 (S.D.N.Y.1992). *See also* May Department Stores Co. v. International Leasing Corp., Inc., 1 F.3d 138 (2d Cir.1993). Elovich argues that although he negotiated Schwartz's check, his letter of January 11, 1996, reserves his rights and indicates his acceptance of the check under protest. This argument is unavailing, however, since his protest occurred almost a full week after he cashed the check. *See generally* 19 NYJur.2d Compromise, Accord and Release §§ 26–42 (1987). Section 1–207 of the New York Uniform Commercial Code states in pertinent part: A party who with explicit reservation of rights performs or promises performance or assents to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved. Such words as "without prejudice," "under protest" or the like are sufficient. **To be effective, however, the reservation of rights, must be contemporaneous with the negotiation of the check**. In Sarbin v. Southwest Media Corporation, 179 A.D. 567 (1st Dep't 1992), the First Department decided this very issue in a case with remarkably similar facts: In a dispute where plaintiffs claim that defendants owe them $125,000, plaintiffs accepted and deposited a check for $30,000, explicitly tendered by defendants in full settlement of all claims, without any restrictive endorsement or other contemporaneous or prior reservation of rights. Not until nearly a week later did plaintiffs purport to reserve their rights by letter. While a letter can be sufficient to reserve rights under UCC 1–207, (*Ayer v. Sky Club, Inc.,* 70 A.D.2d 863, 418 N.Y.S.2d 57, *appeal dismissed,* 48 N.Y.2d 705, 422 N.Y.S.2d 68, 397 N.E.2d 758) we are unaware of any case that has ever expressly

20

interpreted that provision to allow a reservation of rights by letter several days after a settlement check had already been accepted without any contemporaneous reservation of rights. Thus, Elovich's letter, dated six days after he cashed Schwartz's check, cannot possibly reserve his rights since it was not contemporaneous with the negotiation of the check." Elovich v Schwartz, at 3-4 (*emphasis added*).

In 1985, New York Court of Appeals definitively put to rest any question about whether UCC1-207 applied only to Article 2 contracts by rejecting that narrow interpretation and holding that any endorsement of a check was, by definition, governed by the Article 3 law of negotiable instruments. Accordingly, per that ruling, §1-207 applied to **any partial payment dispute (so long as payment was made by a negotiable instrument, like a check)** <u>regardless</u> of whether the parties' underlying relationship was predominantly one concerning the sale of goods or services. Thus, in <u>Horn Waterproofing Corp. v. Bushwick Iron & Steel Co., Inc.</u>, 66 N.Y.2d 321 (1985), New York's high court answered a question of first impression by deciding that the common-law doctrine of accord and satisfaction had been superseded by UCC §1-207 in situations involving the tender of a negotiable instrument as full payment of a disputed claim.

In our case, Plaintiffs waived any rights they may have had to dispute the amount of their commissions, when they had failed to state, in writing, a restrictive endorsement reserving their rights as they accepted and negotiated[13] the commission checks. Plaintiff Leevson testified that Aqualife paid all commissions for Leevson and Leibzon's sales by checks to Plaintiff Matana, which were given to her husband Michael Leibzon. Ex. 14, p.

---

[13] to convert into cash or the equivalent value <*negotiate* a check>. See Merriam-Webster Dictionary online, http://www.merriam-webster.com/dictionary/negotiate

106.  Leibzon confirmed that all compensation paid by Aqualife was in the form of checks, payable to Matana, Ex. 15, p. 25-27, 47, 109.  Leibzon also testified that he had to sign a "photocopy of the check" to signify the receipt thereof, and that it was "everything that was owed" for a particular month. Ex. 15, p. 91. Although Leibzon had made a number of writings on the checks, which ranged from "you've returned the money stolen from me", "finally gave birth", "if I didn't threaten a hunger strike, I wouldn't be paid", to a simple "thank you", which he expected to be brought to the attention of Aqualife's owners, however Leibzon "never" wrote there that not all commissions had been paid. Ex. 15 at 99, 113, 117, 135, 137-140, Ex. 21. Thus, Leevson and Leibzon had waived their reservation of rights in regards to any such claims, according to Sarbin, Elovich, and Horn decisions, as set forth above.

Tsigel had similarly testified that she had never received a personal check from Aqualife during her entire six years tenure there, that all checks for her services were issued to Vadkat, and that all such Aqualife's checks were then deposited into Vadkat's bank account. Ex. 13, p. 35, 58. Although Tsigel testified that she had complained about being underpaid, her complaints were always verbal and never in writing. Ex. 13, p. 43-44.

Finally, when Pustov was asked if he ever wrote "accepted under protest" on Aqualife's commission checks, which he claims did not fully compensate him for his sales, Pustov, as did the other Plaintiffs, responded in the negative. Ex. 16, p. 84-85, Ex. 25 p. 74-75, 95. Since the Plaintiffs had never reserved their rights in writing, contemporaneously with negotiating Aqualife's checks, Plaintiffs had "assented to performance" by Aqualife, within the meaning of UCC §1-207, and had waived their

22

right to dispute the amount of commissions paid to them by Aqualife. Accordingly,

Defendants are deemed to have fully performed their obligations under the commission

agreements with the Plaintiffs, which provides complete defense to Plaintiffs' breach of

contract claims. Therefore, Plaintiffs' Fourth, Fifth, Sixth, and Ninth Causes of Action

should be dismissed as a matter of law.


**IV.   PLAINTIFFS' CLAIMS FOR ACCOUNTING SHOULD BE DISMISSED
BECAUSE PLAINTIFFS HAD NO FIDUCIARY RELATIONSHIP WITH
DEFENDANTS AND BECAUSE PLAINTIFFS HAD PLED AN ADEQUATE
REMEDY AT LAW.**

Plaintiffs' claim for an Accounting contained in the Third Cause of Action must

be dismissed because the Plaintiffs and Defendants did not have a fiduciary relationship,

the Plaintiffs did not entrust the Defendants with any money or property, and the

Defendants have an adequate remedy at law under their breach of contract claims.

**a.      Plaintiffs' claim for an Accounting must be dismissed because Plaintiffs
failed to plead and establish the existence of a fiduciary relationship and
entrustment of money or property to the defendants.**

The Court should apply New York law to Plaintiffs' equitable claim for an

accounting. *See* AIG Europe (Netherlands), N.V. v. UPS Supply Chain Sols., Inc., 765

F.Supp.2d 472 (S.D.N.Y.2011) ( "[W]here the parties' 'briefs assume that New York law

controls, ... such 'implied consent ... is sufficient to establish choice of law.' Associated

Mortgage Bankers, Inc. v. Calcon Mutual Mortgage LLC, 2016 WL 519659 (EDNY

2016). "To state a claim for an accounting under New York law, a plaintiff must

establish: (1) relations of a mutual and confidential nature; (2) money or property

entrusted to the defendant imposing upon him a burden of accounting; (3) that there is no

adequate legal remedy; and (4) in some cases, a demand for an accounting and a refusal."

Rosa v. TCC Commc'ns, Inc., 2016 WL 67729, (S.D.N.Y., 2016) (*citing* IMG Fragrance

Brands, LLC v. Houbigant, Inc., 679 F.Supp.2d 395, 411 (S.D.N.Y.2009)); *see also*

Soley v. Wasserman, 2016 WL 321176 (2d Cir., 2016) (*accord* Unitel Telecard

Distribution Corp. v. Nunez, 90 A.D.3d 568 (1st Dept. 2011); Kastle v. Steibel, 120

A.D.2d 868 (3d Dept. 1986).

      With respect to the first element, it is well-established that "to sustain an equitable

action for accounting under New York law, a plaintiff must show either a fiduciary or

confidential relationship with the defendant." Leveraged Leasing Admin. Corp. v.

PacifiCorp Capital, Inc., 87 F.3d 44, 49 (2d Cir.1996) (*citing* Palazzo v. Palazzo, 121

A.D.2d 261 (1st Dept. 1986)). Under New York law, a "confidential relationship" in this

context refers to "a relationship 'which induced plaintiff to entrust defendant with

property or money.' " KJ Roberts & Co. Inc. v. MDC Partners Inc., 2014 WL 1013828,

(S.D.N.Y., 2014). Further, " '[a] fiduciary relationship arises when one has reposed trust

or confidence in the integrity or fidelity of another who thereby gains a resulting

superiority of influence over the first, or when one assumes control and responsibility

over another.' " Faulkner v. Arista Records LLC, 602 F.Supp.2d 470 (S.D.N.Y.2009).

However, " 'generally, an arm's length business transaction, even those where one party

has superior bargaining power, is not enough to give rise to a fiduciary relationship.' "

Faulkner, 602 F.Supp.2d at 482 (*quoting* Sony Music Entertainment, Inc. v. Robison, et

al., 2002 WL 272406 (S.D.N.Y. 2002)); *see also* Reuben H. Donnelley Corp. v. Mark I

Mktg. Corp., 893 F.Supp. 285 (S.D.N.Y.1995) (" '[A] conventional business relationship

does not create a fiduciary relationship in the absence of additional factors[.]'") Feigen v.

Advance Capital Mgmt. Corp., 150 A.D.2d 281 (1st Dept. 1989). Of importance, New

York courts have repeatedly dismissed accounting claims where the parties' relationship arises from a contract. Such 'arm's length business dealings' have been found insufficient to state an accounting claim under New York law. *See, e.g., <u>Rosa</u>,* 2016 WL 67729 at 7.

Here, the Amended Complaint describes a contract between Plaintiffs and Defendant Aqualife, to perform certain sales services in consideration for the payments of commissions for all sales of Aqualife's products, which were made by Plaintiffs. There are no allegations—not even conclusory ones—so as to transform this ordinary commercial relationship into a fiduciary one. Therefore, the Plaintiffs' cause of action for an accounting should be dismissed because Plaintiffs fail to plead and allege, and the record offers no support for, the presence of any fiduciary relationship between the parties in this action.

**b.      Plaintiffs have asserted claims for breach of contract, which is an adequate remedy at law, and which precludes equitable claims for an accounting.**

With respect to the third element of an accounting claim—namely, whether there is no adequate remedy at law— New York courts have held that "an equitable accounting claim cannot coexist with a breach of contract claim covering the same subject matter." <u>Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.</u>, 837 F.Supp.2d 162 (S.D.N.Y.2011). That is because a plaintiff would be able to obtain the information and damages through discovery of his or her breach of contract claim, and thus, he or she has an adequate remedy at law. *See* <u>Gate Techs., LLC v. Delphix Capital Markets, LLC</u>, 2013 WL 3455484 (S.D.N.Y. 2013) (" 'Plaintiff[s] ha[ve] sought money damages in their breach of contract claim, and because discovery as to the measure of damages would be available to them if they were to prevail on that claim, they can obtain all the information they seek in their existing claim at law.' ") (*quoting* <u>Banks v. Correctional Servs. Corp.</u>,

25

475 F.Supp.2d 189 (E.D.N.Y.2007); CSI Inv. Partners II, L.P. v. Cendant Corp., 507

F.Supp.2d 384, 425 (S.D.N.Y.2007) ("An accounting claim is not proper where money

damages are recoverable under alternative causes of action for the same injury." *citing*

Banks, 475 F.Supp.2d at 202.

      Here, Plaintiffs assert six causes of action sounding in breach of contract, all of

them seeking money damages. During the discovery phase of this litigation, the Plaintiffs

demanded and received voluminous documentary disclosures from the Defendants.

Plaintiffs had taken depositions of all the Defendants-Principals of the Defendant

Aqualife, and had deposed the corporate accountants as well. Accordingly, since

Plaintiffs were able to obtain the information about their claims and damages through

discovery of their breach of contract claim, they therefore have "an adequate remedy at

law" and their demand for accounting should be dismissed.


**V.      PLAINTIFFS' CLAIMS FOR VIOLATION OF WAGE THEFT
PREVENTION ACT ("WTPA") SHOULD BE DISMISSED BECAUSE
PLAINTIFFS STARTED WORKING BEFORE WTPA TOOK EFFECT AND
PLAINTIFFS WERE NOT EMPLOYEES OF THE DEFENDANT.**

      Plaintiffs' Tsigel and Leevson's claims for violations of WTPA contained in the

Ninth and Tenth Cause of Action must be dismissed because, as set forth above,

Defendant Aqualife was never Plaintiffs' employer as defined by WTPA, and because

WTPA does not apply retroactively before its enactment on April 9, 2011.

      In 2010, the New York State Legislature passed the Wage Theft Prevention Act

(the "WTPA") in an effort "to expand the rights of employees to seek civil and criminal

avenues of remedy" against their employers who fail to comply with the labor law. N.Y.

Sponsors. Memo., 2010 S.B. 8380, 233rd Leg., 2010 Reg. Sess. (Oct. 28, 2010). The

WTPA amended NYLL § 195(3) to require employers to "furnish each employee with a statement with every payment of wages" that lists various categories of information, including, "the number of overtime hours worked." <u>NYLL</u> § 195(3). An employer's failure to comply with §195(3) results in a civil penalty of $250 for each violation up to $5,000 per employee. *See* <u>NYLL</u> § 198(1–d), <u>Copper v. Cavalry Staffing, LLC</u> 132 F.Supp.3d 460 (E.D.N.Y. 2015)

Under the WTPA, "an employer must provide an employee with a wage notice within ten business days of the start of employment and then annually every February thereafter." <u>Yuquilema v. Manhattan's Hero Corp.</u>, 2014 WL 4207106 (S.D.N.Y. 2014), *adopted*, 2014 WL 5039428 (S.D.N.Y. 2014) (*citing* <u>NYLL</u> § 195(1)(a)). "Prior to February 27, 2015, the WTPA allowed employees to recover, as statutory damages for violations of this wage notice requirement, $50 per work week, not to exceed $2,500." <u>Inclan v. N.Y. Hospitality Group, Inc.</u>, 2015 WL 139959 (S.D.N.Y. 2015).

However, an employee who began working **before the WTPA took effect on April 9, 2011**, may not bring a claim for an employer's failure to provide wage notices. <u>Inclan v. N.Y. Hospitality Group, Inc.</u>, at 8. ("For those plaintiffs who were hired before the WTPA took effect on April 9, 2011, the failure of the Restaurant to provide tip credit notice at the time of hiring cannot support a claim under the WTPA, as the Second Circuit has held that the WTPA does not apply retroactively. <u>See Gold v. N.Y. Life Ins. Co.</u>, 730 F.3d 137 (2d Cir.2013).")

According to the Amended Complaint, Tsigel commenced work at Aqualife in 2006, was promoted to office manager in 2007, and ended her engagement on November 9, 2012 . <u>Ex. 4</u>, ¶¶31, 34, 81. She cannot recover damages under WTPA prior to April

2011, since according to Inclan, WTPA cannot be applied retroactively. Even assuming for the purposes of this argument that Tsigel was employed by Aqualife, which is expressly denied by the Defendants otherwise, Tsigel's damages claim of $232,220.50 "plus liquidated damages … attorneys fees, costs and disbursements", Ex. 4, ¶95, is wildly overstated. The statutory damages for violations of the wage notice requirement are only $50 per work week, not to exceed $2,500. Id.

Similarly, Leevson commenced work at Aqualife in May 2009. Ex. 4, ¶19. Under Inclan, she is precluded from recovering under WTPA for any violations that might have occurred prior to April 2011. Leevson's damages claim of $47,750 "plus liquidated damages … attorneys fees, costs and disbursements", Ex. 4, ¶90, is clearly unavailing, since at most that she would be entitled to recover would be $2,500, and that is only, if the Plaintiffs were able to establish that Leevson was an employee of Aqualife, rather than an independent business owner.

**VI. DISMISSAL OF PLAINTIFFS' EIGHTH CAUSE OF ACTION IS WARRANTED BECAUSE THERE IS NO EVIDENCE UPON WHICH A REASONABLE FACTFINDER COULD BASE A VERDICT IN THE PLAINTIFFS' FAVOR**

Plaintiff Katherine Tsigel's claims for breach of contract contained in the Eighth Cause of Action, in which Tsigel alleges that Defendants failed to pay Tsigel's agreed-upon salary for the entire six-year period of her working at Aqualife, are so implausible, contradictory, and inherently unreliable, that it would be impossible for any reasonable jury to find for Tsigel. In addition, Tsigel's claims are barred by Statute of Frauds as a matter of law, since the alleged agreement to pay wages was never reduced to writing. Thus, the summary judgment is warranted and appropriate under the circumstances.

In the Amended Complaint, Tsigel claims that "pursuant to the agreements with Defendants", she was to be paid an hourly salary, which was separate from her commissions. Ex. 4, ¶81. Between 2007 and 2011, Tsigel claims the agreement was to pay her $10 per hour - while in 2011, Aqualife agreed to increase her salary to $11 per hour. Incredibly, Tsigel now claims that, "no such salary was ever paid" to Tsigel. Ex. 4, ¶81, Ex. 13, p. 29-31, 148-49. Clearly, Tsigel's admission of the $1 per hour raise in 2011, plainly contradicts her allegation that no salary was ever paid to her. Ex. 4, ¶32. It is unreasonable to give any credence to Tsigel's claims, that she was promised a set hourly wage, which was never paid, then received a raise four years later, which was also never paid, and yet that she continued working for Aqualife since 2007 until 2012 under such horrid circumstances. It defies logic, common sense, and everyday experience, that anybody living in the free world would continue to work for any company for six years, if the company had never paid them the promised wages, only because she was "hoping to receive it later". Ex. 13, p. 39-40.

To rebut Tsigel's implausible accusations, Defendants respond with documentary evidence of the weekly payments by Aqualife of Tsigel's wages to her company Vadkat. Additionally, Defendants offer sworn affidavits of Tsigel's co-workers, attesting to the fact that they, and Tsigel, regularly received their checks for hourly wages.

Defendant Sionov states in his Declaration, that Tsigel regularly received a weekly check for hourly wages for her work, paid to her company Vadkat. Sionov had prepared a statement of Tsigel's 2011 hourly wages, Ex. 24, as a sample. It is supported by the bank's copies of the paid checks, Ex. 23, which were provided by Aqualife's corporate accountant. Ex. 12, p.53. The checks were given to Tsigel and subsequently

they were deposited into Vadkat's bank account. According to Ex. 23, every Monday in 2011 Vadkat had been receiving payments for Tsigel's hourly wages, in the $400's to 500's range, which is consistent with Tsigel's claim of entitlement to wages of $10-11 per hour. Ex. 4, ¶32.

Tsigel had identified several individuals who worked at Aqualife contemporaneously with her, and whose work was similar to hers. Ex. 13, at 72-73. These individuals included "Olga", "Karolina Anpilogova", "Diana", and "Gulmara", their last names apparently forgotten by Tsigel. Id. Several of these identified persons had subsequently submitted sworn Affidavits, which lend substantial support to Aqualife's position, that the hourly wages to workers, "similarly situated" and performing comparable tasks to Tsigel, were paid regularly on Mondays. *See* Aff. Gulnara Kuanish, Aff. Diana Mussina, Aff. Gulnara Saakov.

With the exception of Ms. Kuanish, the other affiants are no longer associated with Aqualife in any way, and thus have no reason to misrepresent or "stretch" the facts. In their Affidavits, former and present workers of Aqualife credibly, and in sufficient detail, described the manner of their compensation from Aqualife, and the various tasks, for which they were being compensated by commissions and hourly wages. Most importantly, the affiants attested to having personal knowledge of the fact that Tsigel, just as they were, was also receiving hourly wage compensation on Mondays. These sworn statements by the disinterested parties, derived from their first-hand personal observations of the events described in the Affidavits, establish a complete lack of any genuine issue of the fact whether Aqualife paid hourly wages to Tsigel.

30

Tsigel herself admitted to drafting several letters to AmeriChoice[14] attesting to the fact that she regularly received 'salary' of $450 per week from Aqualife, Ex. 10, Ex. 13, p. 157-60. Tsigel had then submitted these letters to AmeriChoice to obtain low-cost health insurance coverage. If Tsigel's contradictory allegations that Aqualife never paid her hourly wages are true, then Tsigel defrauded Medicaid by preparing and submitting these letters, which contained knowingly false information, and committed perjury by submitting false sworn statements on the application for Medicaid coverage. Ex. 13, p. 183-84. If, however, Aqualife did pay Vadkat for Tsigel's hourly wages as Aqualife claims it did, *see* Decl. Sionov, Aff. Gulnara Kuanish, Aff. Diana Mussina, Aff. Gulnara Saakov, that would render the Amended Complaint's allegations and Tsigel's sworn deposition testimony "so contradictory that doubt is cast upon their plausibility", *see* Aziz Zarif Shabazz v. Pico, 994 F.Supp. 460, (S.D.N.Y.1998), *supra*. Accordingly, the burden of proof should be shifted to Tsigel to present any evidence upon which the jury could reasonably find for her on her claim, that Aqualife never paid her wages.

Tsigel's conclusory allegations, contradictions, inconsistencies, and the complete absence of any corroborating evidence in the record, are wholly insufficient to raise an issue of material fact, precluding summary judgment. Summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

---

[14] AmeriChoice administered Medicaid and Medicare Health Plans until 2011, after which it had changed its name to UnitedHealthcare Community Plan. AmeriChoice by UnitedHealthcare, served 266,000 Medicaid health plan members in the state of New York.
*See* http://www.uhccommunityandstate.com/newsroom/americhoice-public-sector-ny.html

A fact is "material" for these purposes when it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. To defeat summary judgment, therefore, nonmoving parties "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), and they "may not rely on conclusory allegations or unsubstantiated speculation." Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423 (2d Cir.2001) see also Trans Sport, Inc. v. Starter Sportswear, Inc., 964 F.2d 186 (2d Cir.1992) (noting that summary judgment cannot be defeated "on the basis of conjecture or surmise").

At the summary judgment stage, a nonmoving party "**must offer some hard evidence showing that its version of the events is not wholly fanciful**." D'Amico v. City of N.Y., 132 F.3d 145 (2d Cir.1998). In the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," Anderson, 477 U.S. at 252, and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.

In Aziz Zarif Shabazz v. Pico, a §1983 case involving allegations of excessive force against correctional officers, then-District Judge Sotomayor granted summary

judgment, expressly relying on the absence of any corroborating evidence in the record and highlighting the many inconsistencies and contradictions within the plaintiff's deposition testimony and affidavits. As Judge Sotomayor stated in Pico, "when the facts alleged are so contradictory that doubt is cast upon their plausibility, [the court may] pierce the veil of the complaint's factual allegations ... and dismiss the claim." Pico, 994 F.Supp. at 470. Because "[n]o reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in [the] complaint," see Schmidt v. Tremmel, 1995 WL 6250 (S.D.N.Y. Jan. 6, 1995), dismissal of Plaintiffs' Eighth Cause of Action by summary judgment is entirely appropriate under the circumstances.

In addition, Tsigel's breach of contract claim should be dismissed because the alleged agreement fails to satisfy the Statute of Frauds, as codified in New York under Section 5-701(1) of the New York General Obligations Law, infra. Tsigel does not allege that her engagement with Aqualife was mutually agreed to last **less** than one full year. In fact, she had testified that she worked for Aqualife between 2007 and 2012, totaling six years. Under the Statute, any agreement, which is "by its terms is not to be performed within one year from the making thereof ..." must be in writing or it is *void*. Tsigel had testified that Aqualife's offer to pay hourly wages for her work, and her acceptance of the offer, was "all verbal". Ex. 13, p. 26. Accordingly, Tsigel's breach of contract claim fails as a matter of law, and should be dismissed.

## VII. PLAINTIFFS STATE CLAIMS SHOULD BE REMANDED TO STATE COURT IN THE EVENT THAT THE COURT HAS DISMISSED ALL CLAIMS OF ORIGINAL JURISDICTION (FLSA)

This Court has supplemental jurisdiction over the Plaintiffs' state law breach of

33

contract claims because these claims arises from the same case or controversy as Plaintiffs' FLSA claim.  However, as demonstrated above, the Plaintiffs' FLSA claim should be dismissed as the FLSA do not apply to these Plaintiffs, and for failure to assert the FLSA claims before Statute of Limitations has expired.  Therefore, Counts III – X (which have no independent federal jurisdiction) should be remanded to state court.

The Court may decline to exercise supplemental jurisdiction over a claim arising under state law in the following circumstances: (1) the claim raises a novel or complex issue of State law,  (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c).  Therefore, jurisdiction may be declined in the event that the Court has dismissed all claims of original jurisdiction.  Id.  Moreover, pursuant to rule 12(h), Federal Rules of Civil Procedure, a motion for lack of subject matter jurisdiction may be raised at any point by suggestion of the parties.

In this case, as noted supra, Count I and II of the Complaint (relating to the FLSA) should be dismissed.  Therefore, per 28 U.S.C. § 1367(c), if all claims over which this Court has original jurisdiction are dismissed, subject matter jurisdiction may be declined. Therefore, assuming the Plaintiffs' FLSA claims are dismissed, the Defendants would also urge that any remaining state law claims be dismissed in favor of state court proceedings.  The end result would be that, once the FLSA claim is properly disposed of, this entire case be litigated in state court.

**CONCLUSION**

For all of the foregoing reasons, the Defendants respectfully request that this Court grant Defendants' Motion for Summary Judgment dismissing all claims against the Defendants.

DATED:      July 14, 2016        LAW OFFICE OF ROBERT BONDAR
              Brooklyn, New York

*/s/ Robert Bondar*

28 Dooley Street, 3rd floor
Brooklyn, New York 11235
Telephone: (347) 462-3262
rbondar@bondarlaw.com

*Attorney for Defendants*

35