UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

VICTORIA LEEVSON, MICHAEL
LEIBZON, MATANA ENTERPRISES,
LLC, KATHERINE TSIGEL, VADKAT,
INC., VLADISLAV PUSTOV, and
IMPERIAL ENTERPRISE SERVICES,
INC.,

        Plaintiffs,

– against –

AQUALIFE USA, INC., AQUALIFE, INC.,
ALEX GITELMAN, YAKOV SIONOV, and
VLADIMIR GORBACH,

        Defendants.

**MEMORANDUM, ORDER & JUDGMENT**
14-CV-6905

**ON BEHALF OF PLAINTIFFS:**

**Svetlana Sobel**
Sobel Law Offices
175 Eileen Way
Syosset, NY 11791
516-496-1903
Fax: 631-532-4828
Email: ssobel@sobellawpc.com

**ON BEHALF OF DEFENDANTS:**

**Robert Bondar**
Law Office of Robert Bondar
28 Dooley Street
3rd. Floor
Brooklyn, NY 11235
347-462-3262
Fax: 347-462-3261
Email: rbondar@bondarlaw.com

**Emanuel Kataev**
Milman Labuda Law Group, PLLC
3000 Marcus Avenue
Suite 3W8
Lake Success, NY 11042
516-328-8899
Fax: 516-328-0082
Email: emanuel@mllaborlaw.com

**Joseph M. Labuda**
Milman Labuda Law Group, PLLC
3000 Marcus Ave
Suite 3W8
New Hyde Park, NY 11042

516-328-8899
Fax: 516-328-0082
Email: joe@mllaborlaw.com

**JACK B. WEINSTEIN, Senior United States District Judge:**

## Table of Contents

I.   Introduction ..................................................................................................... 4

II.  Facts ................................................................................................................ 4

   A.   Defendants' Product and Nature of Industry................................................ 4

   B.   Plaintiffs ...................................................................................................... 5

   C.   Claims........................................................................................................... 5

   D.   Jury Verdict and Rule 50 Motions .............................................................. 5

     1.   Jury Verdict .......................................................................................... 5

     2.   Rule 50 Motions ................................................................................... 6

   E.   Testimony and Evidence .............................................................................. 7

     1.   Aqualife's Independent Business Owner Contract.............................. 7

     2.   Marketing Plan ..................................................................................... 7

     3.   Vladislav Pustov .................................................................................. 8

     4.   Michael Leibzon ................................................................................... 8

     5.   Katherine Tsigel ................................................................................... 9

     6.   Victoria Leevson.................................................................................. 10

     7.   Yakov Sionov and the Individual Defendants ..................................... 11

III. Law ................................................................................................................. 11

   A.   Rule 50 ......................................................................................................... 11

   B.   Contract Formation and Modification.......................................................... 12

     1.   Intent to be Bound ................................................................................ 12

     2.   Assent ................................................................................................... 13

     3.   Statute of Frauds .................................................................................. 14

   C.   Fair Labor Standards Act and New York Labor Law ................................. 14

     1.   Employee v. Independent Contractor ................................................... 14

       i. Tax Return Status and Estoppel.................................................... 15

       ii. Worker Misclassification.............................................................. 16

       iii. Commissioned Salespersons ....................................................... 19

       iv. Written Consent for Collective Actions........................................ 19

     2.   Overtime Pay ........................................................................................ 20

       i.  "Work" from Home or "On-call" ................................................... 20

      ii.  Mixed Question of Fact and Law ............................................. 22

     iii.  New Technology and a Shifting Paradigm ................................. 22

   3.     Statute of Limitations ................................................... 23

   4.     Notice and Statement Requirements ................................ 23

   5.     Willfulness and Liquidated Damages .............................. 25

   6.     Attorney's Fees and Costs ............................................ 25

   7.     Pre-Judgment Interest .................................................. 26

   8.     New York CPLR Interest Calculations ........................... 26

   9.     Post-Judgment Interest ................................................. 27

IV.    Application of Law to Facts ................................................... 27

  A.   Plaintiffs Assented to the Terms of the Contract as Consistently Applied ........ 27

  B.   Residual Commission is Barred by the Statute of Frauds ................... 28

  C.   Plaintiffs Leevson and Tsigel are Protected by the FLSA and NYLL ............... 28

  D.   Inside Salespeople ........................................................ 30

  E.   Written Consent ........................................................... 30

  F.   Overtime under the FLSA and NYLL ...................................... 30

  G.   Compensation for On-Call or Wait Time ................................. 31

V.     Damages ................................................................... 32

  A.   Breach of Contract ....................................................... 32

  B.   FLSA and NYLL .......................................................... 32

  C.   Liquidated Damages ..................................................... 32

  D.   Pre-Judgment Interest .................................................... 33

   1. Leevson's Interest ...................................................... 34

   2. Tsigel's Interest ........................................................ 34

  E.   Post-Judgment Interest ................................................... 34

  F.   Costs ...................................................................... 34

  G.   Attorney's Fees .......................................................... 35

  H.   Damages Chart .......................................................... 35

VI.    Summation of Rulings on Jury Verdict Findings ......................... 36

VII.   Conclusion .................................................................. 38

VIII.  Appendixes A-D, Relevant Documents .................................. 40

 IX.   Appendix E, Jury Charge and Verdict Sheet ............................. 44

## I.     Introduction

After a four-week trial and complex jury verdict, this memorandum and order addresses pre-and post-verdict Rule 50 motions.

The case involves: (1) a simple contract question of whether critical terms of an agreement were in effect assented to by the consistent conduct of the parties; on this point the jury verdict, granting damages to the plaintiffs, is set aside; (2) whether employees working and classified as independent entities, but under individual contract and control of the employer were entitled to the protection of state and federal wage laws; on this point the jury verdict, finding the wage laws applicable, is affirmed; and (3) whether employees working or "on-call" for their employer after they physically leave the employer's office, while they are at home and under conditions that impede them from going about their normal life, are entitled to overtime pay; on this point the jury's verdict, finding that they were at work while at home, is affirmed.

## II.     Facts

### A.  Defendants' Product and Nature of Industry

Defendant Aqualife USA, Inc., ("Aqualife") sells and services water filtration systems to the Russian speaking community in New York City and its environs.  Trial Tr. 1191:21.  The company was formed in 2004, along with its subsidiary Aqualife, Inc.  Trial Tr. 1190:3-11.  It is owned and operated by defendants Yakov Sionov, Vladimir Gorbach, and Alexander Gitelman.  Trial Tr. 1190:3-11.

The company employs a number of salespeople, who are paid commissions, as well as office staff, who are paid hourly wages and perform clerical and "telemarketing" work under direction of management.  Trial Tr. 1192:1-9.  Some employees are required to create independent corporate entities through which they are paid for the services they render.  Trial Tr. 1192:15-24.

### B. Plaintiffs

All individual plaintiffs were under contract with Aqualife, but were paid through their personal corporations. Plaintiffs Victoria Leevson and her husband, Michael Leibzon, are owners and operators of Matana Enterprises, Inc. ("Matana"). Trial Tr. 1199:1-6. Plaintiff Katherine Tsigel and her husband Vadim Tsigel (who is not a party to this suit) own and operate VadKat, Inc. ("VadKat"). Plaintiff Vladislav Pustov is the owner and operator of Imperial Enterprise Services, Inc. ("Imperial"). Trial Tr. 1197:6-1198:22.

### C. Claims

Each individual plaintiff and their corporation sues Aqualife USA, Inc., Aqualife, Inc., and owners Alex Gitelman, Yakov Sionov, and Vladimir Gorbach, individually, jointly and severally.

They assert claims that they were not paid commissions and wages, in breach of their individual contracts.

Plaintiffs Victoria Leevson and Katherine Tsigel also individually claim under state and federal labor laws that they were not paid wages earned and overtime, and not provided with proper wage statements and notices.

### D. Jury Verdict and Rule 50 Motions

After four weeks of trial and thousands of pages of exhibits, the jury returned a verdict in favor of the plaintiffs on their claims for commissions and wages, overtime pay, and lack of wage statements and notices. *See* App. E, Jury Instructions and Verdict Sheet.

#### 1. Jury Verdict

For breach of contract, the jury awarded: $5,982 for commissions to Matana; $4,056 for commissions to VadKat; $77,500 for commissions to Imperial; $25,680.54 for hourly compensation and $87,989 for commissions to Victoria Leevson; $5,982.60 for commissions to

Michael Leibzon; $48,320.45 for hourly compensation and $159,691.89 for commissions to Katherine Tsigel; and $77,500 for commissions to Vladislav Pustov. Mr. Pustov and his company Imperial were awarded "residual commissions" through 2026. *See* App. E.

Under the FLSA and the NYLL, the jury awarded: $2,500 for wage notice violations, $2,500 for wage statement violations, and $25,680.54 for overtime pay to Victoria Leevson; and $2,500 for wage notice violations, $2,500 for wage statement violations, and $48,320.45 for overtime pay to Katherine Tsigel. *Id.*

## 2. Rule 50 Motions

The defendants orally and in writing made the following motions pursuant to Federal Rule of Civil Procedure 50(a)-(b):

(1) Motion for judgment as a matter of law on plaintiffs' FLSA and NYLL claims, ECF No. 164, Aug. 17, 2017.

(2) Motion for judgement as a matter of law on plaintiffs' breach of contract claims on the ground that plaintiffs assented to the contract terms offered by defendants, ECF No. 165, Aug. 17, 2017.

(3) Motion for judgement as a matter of law on plaintiffs' breach of contract claims for residual commissions as barred by the statute of frauds, ECF No. 166, Aug. 17, 2017.

(4) Letter in support of motion for judgment as a matter of law on plaintiffs' breach of contract claims, ECF No. 167, Aug. 17, 2017.

(5) Reply to plaintiffs' memorandum in opposition to defendants third motion for judgment as a matter of law, ECF No. 181, Aug. 23, 2017.

(6) Fourth motion for judgment as a matter of law on plaintiffs' breach of contract claims against the individual defendants, ECF No. 183, Aug. 27, 2017.

(7) Fifth motion for judgment as a matter of law on plaintiffs' FLSA and NYLL claims against defendants, ECF No. 184, Aug. 27, 2017.

(8) Sixth motion for judgment as a matter of law on the grounds that plaintiffs Leevson and Tsigel are exempt from overtime requirements as commissioned salespersons, ECF No. 187, Aug. 28, 2017.

(9) Motion for judgment as a matter of law, motion for new trial, ECF No. 200, Sept. 29, 2017.

(10) Reply in support re motion for judgment as a matter of law, ECF No. 211, Oct. 22, 2017.

Plaintiffs filed responses to defendants' motions as follows:

(1) Memorandum in opposition to defendants' first motion for judgment as a matter of law, ECF No. 170, Aug. 21, 2017.

(2) Memorandum in opposition to defendants' third motion for judgment as a matter of law, ECF No. 178, Aug. 23, 2017.

(3) Response to defendants' fifth motion for judgment as a matter of law, ECF No. 185, Aug. 28, 2017.

(4) Motion for judgment as a matter of law post-verdict, ECF No. 202, Sept. 29, 2017.

(5) Memorandum in opposition re motion for judgment as a matter of law, ECF No. 210, Oct. 17, 2017.

(6) Memorandum in support of plaintiffs' motion for judgment as a matter of law, ECF No. 212, Oct. 23, 2017.

The court reserved judgment on all Rule 50 motions. After the verdict the court adjourned the case so the parties could fully brief and argue all the issues raised in their motions; it requested submission of a form and amount of judgment, including costs, disbursements, interest, penalties, and legal fees. ECF No. 194, Sept. 1, 2017; *see also* ECF No. 199, Sept. 26, 2017 (Court order directing the contents of parties briefing).

### E.  Testimony and Evidence

#### 1.  Aqualife's Independent Business Owner Contract

Aqualife required every salesperson and most workers to sign an Independent Business Owner ("IBO") contract. The relevant terms of the contract state:

1. IBO is not [Aqualife's] employee or representative. He is an independent legal person, who is familiar with the rules and regulations of the company.

5. IBO is entitled to receive commission fees and profit as per marketing plan of the company.

7. The company reserves the right to change the conditions, prices, marketing plan at any time.

App. A, IBO Contract, Vladislav Pustov.

#### 2.  Marketing Plan

The parties produced different versions of the marketing plan.  *See* App. B, Defendants'
Plan; App. C, Plaintiffs' Plan.  The provenance of both are dubious.  Both, however, are
irrelevant because the invariable practice of the parties defined the critical terms of the
agreement.

### 3.     Vladislav Pustov

Plaintiff Vladislav Pustov met defendant Yakov Sionov in 2005; soon after, he signed an
IBO agreement to sell water filtration systems for Aqualife.  Trial Tr. 55:17-18; App. A.  Mr.
Pustov testified that based on a verbal agreement with Mr. Sionov, he was to receive a thirty-five
percent commission—without deductions—of all sales he made.  Trial Tr. 71:8-13.  He also
would receive a "residual commission" of five percent a year, in perpetuity, from each client that
requires yearly maintenance of their filtration system.  Trial Tr. 79:1-83:17.   Nevertheless,
deductions were consistently taken out of his commission for fees, presents and expenses.  Trial
Tr. 91:1-96:5.

On cross-examination, Mr. Pustov was shown a marketing plan produced by defendants.
He testified that he received this plan in 2006, but that it did not contain the language in the
bottom right corner, describing deductions to be taken from the salesperson's commissions.
Trial Tr. 161:7-20.

After the close of the defendants' case, Mr. Pustov was called as a rebuttal witness and
produced for the first time what he claimed was the original version of the marketing plan that he
was given when he was first hired, and that contained no language about deductions.  Trial Tr.
1613:6-1614:7; App. C.

### 4.     Michael Leibzon

Michael Leibzon signed an IBO agreement with Aqualife to begin selling water filtration
systems in 2009.  Trial Tr. 223:6-9.  He testified that he was told by Vladimir Gorbach that he

would be paid "35 percent straight" commission on each system he sold; he also would receive an extra five percent commission on sales he booked himself, and a yearly five percent residual commission, in perpetuity, from payments for maintenance of the systems. Trial Tr. 227:7-10; 242:15-243:12. He never received a marketing plan. Trial Tr. 231:8-12.

Mr. Leibzon testified that "from the very first check [he] received" deductions were taken out of his commissions. Trial Tr. 330:10-16; 379:14. He routinely objected to the defendants about his payment, and, in 2012, Mr. Leibzon quit working for Aqualife because he believed he was being improperly compensated. Trial Tr. 255:8-12; 267:10-269:16.

### 5. Katherine Tsigel

Katherine Tsigel was hired in 2006 to work in Aqualife's telemarketing department where she would schedule appointments for technicians, resolve complaints, and perform other clerical work. Trial Tr. 448:16-22; 452:22-453-4. She testified that Aqualife's owners agreed to pay her ten dollars hourly, plus ten percent commission for each sale she assisted with and a separate commission for any repairs made to filtration systems. *Id*. In 2011, her pay was raised to eleven dollars an hour. Trial Tr. 578:9-17. Management controlled her work schedule and she "punched" in and out on the office "time clock" each day. Trial Tr. 793:16-21.

Ms. Tsigel never signed an IBO agreement, and never made outside sales for Aqualife. Trial Tr. 451:1-13. Through their company VadKat, Ms. Tsigel and her husband, who was a salesperson for Aqualife, claimed large deductions on their income tax returns for work as independent contractors. Trial Tr. 611:6-618:18.

She testified that she was paid every week for many years, but was never paid the proper wages or commissions, and was always paid through VadKat. Trial Tr. 738:11-19. She claims roughly $1,000 per week in unpaid wages over a period of six years. Trial Tr. 577:15-578:25.

Ms. Tsigel was required by her employer to be available to receive calls at home before and after her regular work hours to assist technicians and salespersons with completing and financing their sales.  Trial Tr. 504:9-505:2; 720:7-22.  After she received these calls she would often continue to do work on her laptop to assist in the sale and then call the technician back to help complete the transaction.  Trial Tr. 807:21-808:19.

### 6.    Victoria Leevson

Victoria Leevson began working for Aqualife as a salesperson in 2009.  Trial Tr. 820:14-15.  She testified that Vladimir Gorbach agreed to pay her a thirty-five percent commission without deductions, plus five percent for self-booking, and a five percent yearly residual commission from maintenance to the filtration systems.  Trial Tr. 828:4-11.  Ms. Leevson says she was regularly paid less than thirty-five percent commission from each sale because of deductions taken for gifts, installation fees and other costs.  Trial Tr. 833:10-11; 837.

After resigning in June 2010, Ms. Leevson was re-hired as an office employee in August of 2011.  Trial Tr. 847:23-848:4.  In her new role, Ms. Leevson answered phone calls, assisted technicians with sales, and dealt with customer cancellations and complaints.  Trial Tr. 875:2-7.  She worked daily in the office from nine to seven, and was to be paid ten dollars hourly and ten percent commissions on any sales she assisted with.  Trial Tr. 879:2-5; 848:9-25.  She "punched" in and out each day.  Trial Tr. 1000:21-23.

Ms. Leevson testified that in her second period of employment she received payments for commissions and wages, but it was always less than the correct amount.  Trial Tr. 872:2-13; 879:16-18.  She claims that her wages were underpaid by $1,240 per week over a period of one year.  Trial Tr. 869:16-13.

After leaving the office each day, Ms. Leevson was required to continue to assist the technicians and salespeople while at home and answer her phone late into the night. Trial Tr. 887:8-17.

### 7. Yakov Sionov and the Individual Defendants

Yakov Sionov, along with Vladimir Gorbach and Alexander Gitelman, founded Aqualife in 2004. Trial Tr. 1190:1-11.

Mr. Sionov testified that the defendants' marketing plan, which included deductions for expenses, gifts and fees, was in effect from 2006 through 2012, and that commissions were always paid on the "net amount" of the sale. Trial Tr. 1208:5-14; 1210:1-12.

Mr. Sionov and the individual defendants claimed they paid Victoria Leevson and Katherine Tsigel their full hourly wages by check every Monday. Trial Tr. 1512:21-1513:3; 1481:9-18; 1482:8-11; 1088:9-11;

Plaintiffs Leevson and Tsigel, according to Mr. Sionov, were compensated for after-hours calls and other work by receiving a commission from any sales they assisted with. Trial Tr. 1340:3-18. They were never paid overtime wages for the time spent making calls at home or the time spent at home "on-call" waiting to assist with an assignment.

## III. Law

### A. Rule 50

At a jury trial, the court may grant a motion for judgment as a matter of law against a party on an issue which a reasonable jury would "have [no] legally sufficient evidentiary basis to find for [that] party." Fed. R. Civ. P. 50(a). A court may reserve decision on a Rule 50 motion and decide after the jury has rendered a verdict. *Unitherm Food Systems, Inc. v. Swift-Eckrich*, 546 U.S. 394, 406 (2006) (finding it within the "District Court's discretion" to permit "the jury to make an initial judgment about the sufficiency of the evidence" before deciding a Rule 50(a)

motion).  Judgment as a matter of law may be granted on any issue raised before the case was submitted to the jury.  Fed. R. Civ. P. 50(a)(2); *Holmes v. U.S.*, 85 F.3d 956, 962 (2d Cir. 1996).

A Rule 50(b) motion, renewing a motion for judgment as a matter of law, may be made no later than "28 days after the entry of judgment."  Fed. R. Civ. P. 50(b); *Presutti v. FDIC*, 24 Fed. Appx. 92, 94 (2d Cir. 2001) ("Rule 50(b) does not require that a motion be made after the entry of judgment; instead it provides that the non-prevailing party may file its 'motion no later than 10 days [now amended to 28 days] after entry of judgment.' As the Advisory Committee Notes for the 1995 amendments to Rule 50 state: 'The phrase no later than is used—rather than within—to include post-judgment motions that sometimes are filed before actual entry of the judgment by the clerk.'").  Under Rule 50(b), relief may only be granted on an issued raised under Rule 50(a) "before the case was submitted to the jury."  *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 486 (2008).

When deciding a Rule 50 motion, the court views the evidence in the light most favorable to the non-moving party.  *Weldy v. Piedmont Airlines, Inc.,* 985 F.2d 57, 59–60 (2d Cir. 1993).

### B.  Contract Formation and Modification

All parties are residents of New York; the place of contracting and most relevant activities ocurred in New York.  New York contract law is controlling.  *Terwilliger v. Terwilliger,* 206 F.3d 240, 245 (2d Cir. 2000).

### 1.      Intent to be Bound

When determining the existence of a contract and its specific terms, "it is necessary to look to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds."  1 Williston on Contracts § 3:4 (4th ed.) (quoting *Gallagher v. Long Island Plastic Surgical Group, P.C.*, 113 A.D.3d 652, 653 (2d Dept. 2014)); *see Brown Bros. Elec. Contractors*, *Inc.*, *v. Beam Constr. Corp.,* 41 N.Y.2d 397, 399 (1977); *see Apex Oil Co. v.*

*Vanguard Oil & Serv. Co. Inc.*, 760 F.2d 417, 422 (2d Cir. 1985) ("The existence of a contract may be established through conduct of the parties recognizing the contract.") (citing *P.J. Carlin Constr. Co. v. Whiffen Elec. Co*., 66 A.D.2d 684 (1978)).

<h3 align="center">2.     Assent</h3>

Parties may acquiesce to modification of a contract by continued conduct or performance under the original or new terms. *Giannone v. Deutsche Bank Securities, Inc.*, 392 F. Supp. 2d 576 (S.D.N.Y. 2005) (finding that an employee who continues to work under new terms created by an employer is "deemed to have ratified the new relationship") (quoting *Kempf v. Mitsui Plastics, Inc.,* 1996 WL 673812, at *6 (S.D.N.Y. Nov. 20, 1996)).  When an employer modifies the terms of an at-will employee's payment, and the employee chooses to remain "after being advised of that change, that employee is deemed to have acquiesced to the new terms of the employment and cannot later claim compensation based on the terms of the original contract." *In re Footstar, Inc.*, 2007 WL 1989290, at *5 (Bankr. S.D.N.Y. July 6, 2007).

An at-will contract may be "modified and different compensation rates fixed without approval of the other party since the dissatisfied party has a right to leave his employment." *Kronick v. L.P. Thebault Co., Inc*., 70 A.D.3d 648, 649 (2d Dept. 2010).  An employee that remains after a contract has been modified is "deemed to have assented to the modification and, in effect, commenced employment under a new contract." *See DuBois v. Macy's East Inc.*, 338 Fed. Appx. 32, 33 (2d Cir. 2009) (quoting *Bottini v. Lewis & Judge Co*., 211 A.D.2d 1006 (3d Dept. 1995)) (dismissing breach of contract claim where employer unilaterally reduced plaintiff's sales territory and plaintiff continued to work; because employee remained in defendant's employment, the plaintiff was deemed to have assented to the modification and, in effect, commenced employment under a new contract).

A contract between an independent contractor and an employer may be modified by the conduct of the parties. *Romaine v. Beacon Lithographic Co.,* 13 Misc. 122, 123 (N.Y.C.P. 1895) (finding that an independent contractor whose weekly commissions were reduced by his employer because of dissatisfaction of services could continue to carry out the agreement under the new terms, but could not later sue for commission owed under the original contract).

### 3.      Statute of Frauds

An oral agreement which by "its terms is not to be performed within one year from the making thereof" is unenforceable. N.Y. General Obligations Law § 5-701(a)(1); *Freedman v. Chemical Const. Corp.*, 43 N.Y.2d 260, 265 (1977) ("The critical test [] is whether by its terms the agreement is not to be performed within a year."). A contract which calls for performance over an indefinite time period is unenforceable under the Statute of Frauds. *Computech Intern., Inc. v. Compaq Computer Corp.*, 2002 WL 31398933 (S.D.N.Y. Oct. 24, 2002) ("Under New York law, contracts of indefinite duration are deemed to be incapable of being performed within a year, and thus fall within the ambit of the Statute of Frauds.").

To satisfy the Statute of Frauds, a writing must contain all of the material terms of a contract. *See Wacks v. King*, 260 A.D.2d 985, 986 (3d Dept. 1999) ("[T]he underlying instrument 'must designate all parties, identify and describe the subject matter and state all of the essential terms of a complete agreement.'") (quoting *Conway v. Maher*, 185 A.D.2d 570, 572 (1992)).

### C.  Fair Labor Standards Act and New York Labor Law

Under the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL") non-exempt workers are entitled to a minimum wage, overtime pay, and formal wage statements and notices. 29 U.S.C. § 201; N.Y. Lab. Law § 652.

### 1.      Employee v. Independent Contractor

Independent contractors are exempt workers, not protected by the state and federal labor laws. *See Brock v. Superior Care, Inc.*, 840 F.2d 1054 (2d Cir. 1988). The determinative inquiry into whether a worker is an employee or an independent contractor pursuant to the FLSA is laid out in a five factor "economic reality" test. The test involves:

> (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business.

*Brock*, 840 F.2d at 1058-59 (citing *United States v. Silk*, 331 U.S. 704, 716 (1947)).

No single factor is dispositive; the primary concern is whether or not the workers are in business for themselves. *Brock*, 840 F.2d at 1059 ("[W]hether, as a matter of economic reality, the workers depend on someone else's business for the opportunity to render services."); *Bartels v. Birmingham,* 332 U.S. 126, 130 (1947).

The test under the NYLL is similar, with a focus on the "degree of control exercised" by the employer. *Bynog v. Cipriani Group*, *Inc.,* 1 N.Y.3d 193, 195 (2003) ("Factors relevant to assessing control include whether the worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule.").

### i. Tax Return Status and Estoppel

An individual's employment status claimed on a tax return is a factor to be considered when deciding whether to classify a plaintiff as an employee or an independent contractor. *Deboissiere v. Am. Modification Agency*, 2010 WL 4340642, at *3 (E.D.N.Y. Oct. 22, 2010) ("[I]t is a significant consideration if the person classifies himself or herself as an independent

contractor for income tax purposes.") (citing *Gagen v. Kipany Productions, Ltd.*, 27 A.D. 3d 1043–44 (3d Dept. 2006)).

Filing a tax return—or classifying a worker—as an independent contractor will not always rise "to the level of estoppel." *Deboissiere,* 2010 WL 4340642, at *3; *see also* IRS Info. Ltr. to Honorable Frank Wolf ("IRS Info. Ltr.") ("Section 31.3121(d)-1(a)(3) of the regulations provides that if the relationship of an employer and employee exists, the designation or description of the relationship by the parties as anything other than that of employer and employee is immaterial. Thus, if an employer-employee relationship exists, it is of no consequence that the employee is designated as partner, co-adventurer, agent, independent contractor, or the like."). The Internal Revenue Service ("IRS") letter indicates that an employee could serve a single employer as both an independent contractor and an employee, and should be classified as both for tax purposes. IRS Info. Ltr. ("In instances where an individual provides services in two separate roles to the same business, the IRS examines separately the relationship between the worker and the business for each performance of services.").

### ii. Worker Misclassification

Employers often classify or require their employees to self-classify as independent contractors under the labor and tax laws, for the benefit of the employer. *See* David Weil, *Lots of Employees Get Misclassified as Contractors. Here's Why It Matters*, Harvard Business Review, July 5, 2017 ("In one telling case, construction workers went home at the end of the week as employees only to be informed on the following Monday that, perhaps by the magic of some unknown force, they had become 'member/owners' of hundreds of limited liability companies, effectively stripping them of federal and state job protections."). They misclassify their workers to avoid liability and gain a competitive advantage. *See* David Bauer, *The*

*Misclassification of Independent Contractors: The Fifty-Four Billion Dollar Problem*, 12

Rutgers J.L. & Pub. Pol'y 138, 141 (2015) ("According to a study done in 2000 of nine states

commissioned by the Department of Labor's Employment Administration, '[t]he number one

reason employers use [independent contractors] and/or misclassify employees is the savings in

not paying workers' compensation premiums and not being subject to workplace injury and

disability-related disputes.'").

Misclassification as independent contractors is sometimes forced on workers with the

threat of firing should the employee refuse:

> Beginning in August 2016, Calcrete forced its workers under threat of termination
> to sign contracts stating they were independent contractors. The company then
> used staffing agencies Dominion Staffing and Southeast Personnel Leasing to pay
> the workers. "It is illegal for employers to use subcontractors to distance
> themselves from the obligation to pay workers, and we will use every tool to
> dissuade employers from this scheme," said Labor Commissioner Julie A. Su.
> "This lawsuit aims to recover the money these misclassified workers should have
> been paid after years of wage theft."

*Labor Commissioner's Office Files $6.3 Million Misclassification and Wage Theft Lawsuit*

*against Glendale Construction Company*, Business Insider, Aug. 14, 2017; *see also* William

Forbath and Brishen Rogers, *New Workers, New Labor Laws*, N.Y. Times, Sept. 4, 2017

("[T]oday, janitors, Amazon delivery drivers and warehouse workers are often employed by

subcontractors who have little real power over their livelihoods. And Uber and Lyft drivers are

misclassified as independent contractors.").

The practice of misclassification can be difficult to regulate; it has been pervasive in New

York for years:

> At heart of contingent work is the misclassification of regular workers as
> independent contractors, a practices that deprives workers of income, benefits
> such as workers compensation, and rights to form bargaining units—and deprives
> government of tax revenues. While some contractors are truly independent high-
> paid professionals, working in Silicon Valley, Hollywood, and the New York
> financial industry while enjoying the flexibility of their various relationships with

the companies that give them assignments, many more are low-paid workers who are misclassified. A Fiscal Policy Institute study of the New York state workforce in 2005 found that 10.6 percent of the private sector workforce was misclassified. Similarly, a study done for the U.S. Department of Labor in 2000 reported that as many as thirty percent of employers misclassified some of their employees.

David Bensman, *Workers on the Edge*, The American Prospect, Apr. 7, 2014.

More recent estimates indicate that New York may have over 700,000 misclassified workers. Sarah Leberstein, *Independent Contractor Misclassification Imposes Huge Costs on Workers and Federal and State Treasuries*, National Employment Law Project, August 2012 ("The New York Task Force reported that it identified 18,500 misclassified workers in 2010, a total of 50,000 since the task force's start in September 2007, and that the NY DOL identified nearly 218,000 misclassified workers through UI audits. Studies that extrapolate from audit data put the actual numbers of misclassified workers at much higher levels: an estimated 368,685 workers in Illinois; 4,792 in Maine; between 125,725 and 248,206 in Massachusetts; 704,785 in New York; between 54,000 and 459,000 in Ohio; 580,000 in Pennsylvania; and 214,000 in Virginia.").

In 2010, United States Deputy Labor Secretary Seth Harris testified at a Congressional Hearing on the problems created by misclassification:

Misclassification as independent contractors also increases the opportunities for tax evasion, and some take advantage of those opportunities, with a resulting loss of Federal and State revenue. Too many workers are being deprived of overtime premiums and minimum wages, forced to pay taxes their employers are legally obligated to pay and are left with no recourse if they are injured or discriminated against in the workplace. Misclassification is no mere technical violation. It is a serious threat to workers and the fair application of the laws Congress has enacted to assure workers have good, safe jobs.

United States Senate, Committee on Health, Education, Labor and Pensions, *Hearing on Leveling the Playing Field: Protecting Workers and Business affected by Misclassification*, Jun.

17, 2010.  The Department of Labor has entered into partnerships with 37 states to combat

misclassification:

> Misclassified employees often are denied access to critical benefits and
> protections they are entitled to by law, such as the minimum wage, overtime
> compensation, family and medical leave, unemployment insurance, and safe
> workplaces. Employee misclassification generates substantial losses to the federal
> government and state governments in the form of lower tax revenues, as well as to
> state unemployment insurance and workers' compensation funds.

*Misclassification of Employees as Independent Contractors*, U.S. Department of Labor,

(available at https://www.dol.gov/whd/workers/misclassification/).

### iii. Commissioned Salespersons

An employer is not liable for overtime or wages to commissioned salespersons under the

FLSA.  29 U.S.C. § 207(i).  For section 207(i) to apply, an employer must show that the worker:

> (1) earns [as his or her regular rate of pay] at least one and one-half times the
> federal minimum wage; (2) earns more than half of his salary in commissions for
> a representative period not less than one month; and (3) is employed by a retail or
> service establishment.

*Charlot v. Ecolab, Inc.,* 136 F. Supp. 3d 433, 449 (E.D.N.Y. 2015).  The regular rate of pay is

defined as the "hourly rate actually paid the employee for the normal, nonovertime workweek for

which he is employed."  29 C.F.R. § 779.419 (quoting *Walling v. Youngerman-Reynolds*

*Hardwood Co.*, 325 U.S. 419 (1945)).

### iv. Written Consent for Collective Actions

The FLSA requires written consent for a plaintiff to participate in a "collective action."

*See* 29 U.S.C. § 216(b); *Scholtisek v. Eldre Corp.*, 229 F.R.D. 381 (W.D.N.Y. 2005) (finding

under the FLSA, a "collective action" provides for an "opt in class"); *Callari v. Blackman*

*Plumbing Supply, Inc.*, 988 F. Supp. 2d 261, 279 (E.D.N.Y. 2013) ("[I]n order to bring a

collective action under the FLSA's two-years statute of limitations, the Plaintiff was required to

not only file a complaint but also to file a written consent form.").  The prerequisite of consent is necessary to ensure that the plaintiffs are actively engaged in the litigation and that the defense is able to properly prepare.  *D'Antuono v. C & G of Groton, Inc.,* 2012 WL 1188197, at *2 (D. Conn. Apr. 19, 2012) ("[T]he purpose of this consent requirement, presumably, is to put the Defendants on notice" and "to ensure that each plaintiff intends to participate in the case and is not simply a procedural figurehead for an enterprising class action lawyer.").

This requirement does not apply to individual plaintiffs suing on their own behalf.  Title 29 U.S.C.A. § 256 clearly delineates between an individual action and a "collective action" filed under the FLSA.  ("[An action under the FLSA] shall be considered to be commenced on the date when the complaint is filed; except that in the case of a collective or class action instituted under the [FLSA]. . . shall be considered commenced . . . (a) on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought.").

## 2.      Overtime Pay

The FLSA and the NYLL require compensation of one and one-half times the regular rate of pay for time worked over forty hours per week.  *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.,* 723 F.3d 192, 200 (2d Cir. 2014).  An employee may only be awarded overtime if he or she performs such work with the employer's knowledge.  *Holfpazel v. Town of Newburgh, N.Y.,* 145 F.3d 516, 524 (2d Cir. 1988).  Neither the FLSA nor the NYLL defines what qualifies as "work" for purposes of overtime pay.  *See* 29 U.S.C.A. § 207(a)(1); *see also O'Neill v. Mermaid Touring, Inc.*, 968 F. Supp. 2d 572 (S.D.N.Y. 2013).

### i.   "Work" from Home or "On-call"

Employment related activities conducted when at home, off-duty, "on-call," or "waiting," may all be considered "work," compensable under the state and federal labor laws. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 136 (1944) ("Facts may show that the employee was engaged to wait, or they may show that he waited to be engaged. His compensation may cover both waiting and task, or only performance of the task itself."); *Holfpazel,* 145 F.3d at 522 (finding a K-9 officer who cares for his assigned police dog while at home and off-duty is entitled to overtime pay, unless the "time devoted to a particular task is *de minimis*").

As pointed out in *Mermaid Touring¸* 968 F. Supp. 2d at 580, the Department of Labor ("DOL") has provided guidance as to when a worker should be compensated for "on-call" hours:

> A stenographer who reads a book while waiting for dictation, a messenger who works a crossword puzzle while awaiting assignments, fireman who plays checkers while waiting for alarms and a factory worker who talks to his fellow employees while waiting for machinery to be repaired are all working during their periods of inactivity. The rule also applies to employees who work away from the plant. For example, a repair man is working while he waits for his employer's customer to get the premises in readiness. The time is worktime even though the employee is allowed to leave the premises or the job site during such periods of inactivity. The periods during which these occur are unpredictable. They are usually of short duration. In either event the employee is unable to use the time effectively for his own purposes. It belongs to and is controlled by the employer. In all of these cases waiting is an integral part of the job. The employee is engaged to wait.

29 C.F.R. § 785.15

The DOL has also defined time that is, "off-duty," and non-compensable:

> Periods during which an employee is completely relieved from duty and which are long enough to enable him to use the time effectively for his own purposes are not hours worked. He is not completely relieved from duty and cannot use the time effectively for his own purposes unless he is definitely told in advance that he may leave the job and that he will not have to commence work until a definitely specified hour has arrived. Whether the time is long enough to enable him to use the time effectively for his own purposes depends upon all of the facts and circumstances of the case.

29 C.F.R. § 785.16

The touchstone for "on-call" hours is whether the assignment is so unpredictable and encompassing that a worker has been "engaged to wait." *Skidmore*, 323 U.S. at 136; *see Moon v. Kwon,* 248 F. Supp. 2d 201 (S.D.N.Y. 2002).

### ii. Mixed Question of Fact and Law

Determining what constitutes "hours worked" is a mixed question of fact and law. *Holfpazel,* 145 F.3d at 522. If the court determines "as a matter of law" that the plaintiffs' activities "potentially constitute work," the jury must then decide how much of the plaintiffs' time is compensable within the court's legal framework. *Id.*

### iii. New Technology and a Shifting Paradigm

The advent of new technology has drastically expanded the scope of "work" and "on-call" time for employees:

> [T]he FLSA was written and the seminal cases interpreting the Act were decided at a time when work usually had to be done on the production line, in a mine, or at least in the office. Neither the FLSA nor the Court envisioned the ease with which workers could work in the twenty-first century, especially the ease with which employees could accumulate substantial overtime hours from the comfort of their homes. As such, it is important to recognize the Court's emphasis on interpreting the FLSA through practical industrial realities. The reality of smart phones is that they can help workers be more productive and more connected with work, but at the same time they can be used to accumulate substantial amounts of overtime.

*Controlling Smart-Phone Abuse: The Fair Labor Standards Act's Definition of "Work" in Non-Exempt Employee Claims for Overtime*, 58 U. Kan. L. Rev. 737, 772–73 (2010).

Smartphone as well as email usage causes an increasingly unpredictable and unescapable work environment that blurs the lines between work and free time. Maria L. Barbu, *The Ubiquitous Blackberry: The New Overtime Liability*, 5 Liberty U.L. Rev. 47, 65 (2010) ("[A] proper analysis of smartphone on-call situations involves courts going beyond the traditional framework of the on-call standard . . . Courts need to consider the opportunities afforded by

smartphone use and the negative effects of smartphone use, such as geographic flexibility or blurring of work-free time segmentation . . . Employees are checking their smartphones before they fall asleep, immediately when they wake up, while watching a baseball game with the family, while on their way to work, or while having coffee at the local coffee shop.") (internal quotations omitted).

It has been argued that the FLSA should be more flexible in its analysis of "on-call" time:

> Clifford Sharp, a noted scholar in the area of economics and time, has argued that to divide time into only two categories—work time and non-work time—is "an extremely crude and not very logical division." Nevertheless, the FLSA does precisely that. Under the FLSA, a line has been drawn where an employee is either working or not working. While this division may be convenient, it is imprudently rigid and, by its very terms, unable to equitably account for the realities of on-call employment relationships. During congressional hearings on the FLSA, the statute's chief advocate, President Franklin D. Roosevelt, spoke of ensuring that a person would receive a "fair day's pay for a fair day's work." Indeed, a central motivation for enacting the FLSA was to ensure that people received compensation based, at least in part, on the value of their services. Against this backdrop, this Comment submits that an equitable employment relationship is one in which an employee is compensated at a level that is roughly commensurate to the benefit that the employee provides to his employer per their employment agreement. Under a strict dichotomy in which an employee's time is considered either fully-compensable work or non-compensable leisure time, the establishment of an equitable on-call employment relationship proves largely elusive. Whether the time is considered work or leisure, one party will receive an undeserved windfall.

Loren Schwartz, *Reforming the Fair Labor Standards Act: Recognizing on-Call Time As A Distinct Category of Compensable Work*, 40 U.S.F. L. Rev. 217, 221–23 (2005).

### 3. Statute of Limitations

The NYLL allows for recovery within a six-year statute of limitations. N.Y. Lab. Law § 198(3). In contrast, the FLSA allows for a maximum recovery period of three-years. 29 U.S.C. § 255(a).

### 4. Notice and Statement Requirements

The NYLL requires that every employer shall provide employees:

> [A]t the time of hiring, a notice containing the following information: the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; the regular pay day designated by the employer in accordance with section one hundred ninety-one of this article; the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer.

N.Y. Lab. Law § 195(1)(a).

Any employer who fails to provide proper wage notices to his employees is subject to a penalty to the workers of twenty-five hundred dollars, or "fifty dollars for each work day that the violations occurred or continue to occur," whichever amount is greater. N.Y. Lab. Law § 198(1-b) (this section was amended effective February 27, 2015, to allow for a maximum penalty of $5,000, however, this amendment does not apply retroactively). *Zhang v. Red Mountain Noodle House Inc.*, 2016 WL 4124304, at *5 (E.D.N.Y. July 5, 2016).

Employers must also provide each employee with a wage statement for each wage payment, listing:

> [D]ates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; and net wages. For all employees who are not exempt from overtime compensation as established in the commissioner's minimum wage orders or otherwise provided by New York state law or regulation, the statement shall include the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked.

N.Y. Lab. Law § 195(3).

Failure to provide proper wage statements for each pay period subjects an employer to a penalty of one hundred dollars per week, not to exceed a total of twenty-five hundred dollars. N.Y. Lab. Law § 198(1-d) (this section was amended effective February 27, 2015, to allow for a

daily penalty of $250 or a maximum of $5,000, however, this amendment does not apply retroactively). *Zhang*, 2016 WL 4124304, at *5.

### 5. Willfulness and Liquidated Damages

An employee improperly denied minimum wages or overtime under the FLSA may be entitled to double damages. 29 U.S.C. §§ 216(b), 260. Unless the employer proves that it acted in good faith, it will be held liable. *Southern New England Telecomm. Corp.,* 121 F.3d 58, 71 (2d Cir. 1997) ("[T]he employer bears the burden of establishing, by plain and substantial evidence, subjective good faith . . . The burden, under 29 U.S.C. § 260, is a difficult one to meet, however, and double damages are the norm, single damages the exception.").

Under New York State law, an employee may recover unpaid wages plus an additional amount as liquidated damages, equal to 25% prior to April 9, 2011, and 100% after April 9, 2011, of the total under-payments found to be due. New York Labor Law § 198(1-a). New York applies the same "good faith" standard used by the FLSA to determine if an employer is liable for liquidated damages. *Li v. Leung*, 2016 WL 5369489, at *17 (E.D.N.Y. June 10, 2016).

### 6. Attorney's Fees and Costs

Both the FLSA and NYLL direct courts to award attorney's fees as well as costs to a prevailing plaintiff. *See* U.S.C. § 216(b); NYLL § 663(1). District Courts have considerable discretion in this area. *Hensley v. Eckerhart,* 461 U.S. 424, 437 (1983); *L-3 Communications Corp v. OSI Systems, Inc.*, 607 F.3d 24, 30 (2d Cir. 2010) ("[A]s a rule, a district court has broad discretion in awarding costs . . . and an award of costs may be set aside only for abuse of discretion.") (quoting *Lerman v. Flynt Distrib. Co.*, 789 F.2d 164, 166 (2d Cir. 1986)).

The "most critical factor" in determining costs and attorney's fees is the plaintiffs' "degree of success." *Barfield v. New York City Health and Hospitals Corp.,* 537 F.3d 132 (2d Cir. 2008) (quoting *Farrar v. Hobby,* 506 U.S. 103, 114 (1992)). Courts typically award fees

based on a reasonable hourly rate, multiplied by a reasonable number of hours worked. *Luciano v. Olsen Corp.*, 109 F.3d 111, 115 (2d Cir. 1997).

### 7. Pre-Judgment Interest

Plaintiffs awarded liquidated damages, under the FLSA, may not also receive pre-judgment interest. *Brock*, 840 F.2d at 1064. A plaintiff, however, may receive pre-judgment interest and liquidated damages under the NYLL. *Reilly v. Natwest Markets Grp., Inc.,* 181 F.3d 253, 265 (2d Cir. 1999).

Pre-judgment interest is calculated only on the amount of unpaid wages due, not on the liquidated damages award. *Janus v. Regalis Const., Inc.,* 2012 WL 3878113, at *8 (E.D.N.Y. July 23, 2012).

### 8. New York CPLR Interest Calculations

New York CPLR § 5001(a)-(c) allows for recovery of 9% interest per annum from a "single reasonable intermediate date" . . . "to the date the verdict was rendered." *Gunawan v. Sake Sushi Restauarant*, 897 F. Supp. 2d 76, 93 (E.D.N.Y. 2012) (noting that median date between the earliest ascertainable date the cause of action existed and the date the action was filed, is the date pre-judgment interest will begin to incur).

New York CPLR § 5002 awards 9% interest per annum on "the total sum awarded, including interest to verdict," from the date of the verdict to the date of judgment. ("Interest shall be recovered upon the total sum awarded, including interest to verdict, report or decision . . . from the date the verdict was rendered or the report or decision was made to the date of entry of final judgment."); *see* Siegel, N.Y. Prac. § 411 (5th ed.) ("Suppose, for example, that on October 18 the plaintiff is awarded a verdict of $20,000 on a property damage claim accruing exactly three years earlier. At 9% per year, interest on that sum would be $5400, and the verdict should then be treated as one for $25,400. Assume judgment is entered three days later, on October 21.

If [N.Y. CPLR § 5002] interest is distinctly treated, the sum of $25,400 would bear three days interest, amounting to about $18.79, for a total of $25,418.79, to go in as the initial judgment figure.").

### 9. Post-Judgment Interest

Prevailing plaintiffs are entitled to post-judgment interest pursuant to Title 28 U.S.C. § 1961. ("Interest shall be allowed on any money judgment in a civil case recovered in a District Court."). Post-judgment interest is calculated at the "weekly average 1-year constant maturity Treasury yield." *Id.*

## IV. Application of Law to Facts

### A. Plaintiffs Assented to the Terms of the Contract as Consistently Applied

Viewed in the light most favorably to the plaintiffs, the evidence demonstrates that an at-will contract existed between each plaintiff and each defendant to pay a thirty-five percent commission without deductions for expenses, fees, or presents to the prospective buyer. For plaintiffs Victoria Leevson and Katherine Tsigel, this contract also included a sum of wages. Compensation under these contracts, however, was invariably paid out by defendants at less than the agreed upon rates, and acquiesced to by the plaintiffs.

Plaintiffs testified that during their entire employment they consistently received a thirty-five percent commission on the sales price, after deductions for expenses, presents and fees. They testified that this practice was invariable and continued for years, that the defendants informed them that they were deducting the fees from their commissions, and that they continued to work for the defendants under these terms. While they complained, they accepted these payments and continued working.

Leevson and Tsigel, testified that they never received the proper payment of their wages, and typically could not distinguish whether they were receiving payment for their hourly wages

or commissions. Over a period of six years for Tsigel, and one year for Leevson, each received weekly payments, but always less than the proper amount, as they interpreted their contracts.

The plaintiffs, after years of performing and accepting payment under the terms insisted upon by the defendants, and so paid by them, provide no credible claim for breach of contract. *See DuBois* 338 Fed. Appx. at 33; *Bottini*, 211 A.D.2d at 1006; *Romaine,* 13 Misc. at 123 ("[A]ssuming the interpretation of the original agreement contended for by plaintiff to be correct, he had a right to demand the full amount of the weekly payments; he, however, had a right to waive consideration and carry out the modified agreement, and if he did this, executing it, he cannot revoke it and sue for the larger sum.").

### B. Residual Commission is Barred by the Statute of Frauds

Plaintiffs claim they had a verbal agreement to be paid a five percent "residual commission" on yearly maintenance to all filtration systems they sold; this contract, which would function as a "pension" and would be paid out indefinitely, cannot be performed within one year. It is therefore unenforceable under the statute of frauds. *See* N.Y. General Obligations Law § 5-701(a)(1).

Plaintiffs' argument that this agreement was memorialized in writing by the marketing plan also fails. The marketing plan fails to reference a requirement for the defendants to pay a residual commission in perpetuity. *See Conway v. Maher*, 185 A.D.2d 570, 572 (1992).

### C. Plaintiffs Leevson and Tsigel are Protected by the FLSA and NYLL

Defendants argue that plaintiffs Leevson and Tsigel were exempt from overtime requirements under the FLSA and NYLL because they claimed independent contractor status on their tax returns, and did not have an employer-employee relationship with the defendants.

Under the FLSA "economic reality" test, both Leevson and Tsigel were bound by the decisions of management. They worked set hours each day, were paid hourly wages, "clocked"

in and out, made calls from the office to set up appointments for Aqualife technicians, and assisted with customer complaints and cancellations.  *See Brock v. Superior Care*, 840 F.2d 1054, 1060 ("Superior Care unilaterally dictated the nurses' hourly wage . . . and supervised the nurses by monitoring their patient care notes and by visiting their job sites.").

While commissions on sales were allegedly promised by defendants, it is evident that such added benefits were never or sparingly paid, eliminating any prospect for individual economic success.  Some skill was involved in booking appointments, but this did not give rise to economic independence, and is not the type of work that requires advanced training.  Leevson and Tsigel's work was integral to the structure and day to day functioning of Aqualife and their business activities were strictly controlled in detail by defendants.  *See Taxi Workers Alliance v. Uber Technologies, Inc*., Case No. 016-23858, New York (2017, ALJ Burrows) ("Based on the aforementioned factors and current New York Labor Law, I find that while there are some indicia of claimant's independence, the overriding evidence establishes that Uber exercised sufficient supervision, direction, and control over key aspects of the services rendered by claimants such that an employer-employee relationship was created.")

Although tax status is a factor that weighs against plaintiffs, it is not on its own dispositive.  On the evidence, the jury could have found that the plaintiffs lacked the economic sophistication to understand that their claim of independent contractor status through their IBO's might impede their ability to collect overtime payments, or that the evidence when examined as a whole indicated that plaintiffs were under the control of management, as employees, not independent contractors.  *See Brock*, 840 F.2d at 1059.  The jury may have reasonably believed plaintiffs' testimony that they were required to self-classify as independent contractors in order to work for the defendants, thus negating the fact that they filed taxes as independent contractors.

Plaintiffs' case is even stronger under the NYLL, which focuses on the "degree of control exercised" by the employer. *Bynog,* 802 N.E.2d at 1090. The jury could reasonably have concluded that the defendants controlled the schedule, hours, pay, place of work, and tasks of the plaintiffs.

Examining the totality of the circumstances, the jury finding that plaintiffs Leevson and Tsigel worked as employees under the FLSA and NYLL is amply supported by the evidence.

### D. Inside Salespeople

The jury finding that plaintiffs Leevson and Tsigel are not barred from recovery as "commissioned salespeople" is supported by the evidence. The facts at trial, as well as the jury findings, indicate that most of the plaintiffs' compensation was from their weekly salary, not commissions. 29 C.F.R. § 779.419.

### E. Written Consent

The plaintiffs were not required to file written consent to sue because this case did not proceed as a collective action. *See* 29 U.S.C. § 216(b). The original complaint named each individual plaintiff, never claiming to be brought on behalf of those similarly situated, and proceeded only on claims on behalf of the individually named plaintiffs. *See* ECF No. 1, Nov. 24, 2014.

### F. Overtime under the FLSA and NYLL

Because plaintiffs were not classified as independent contractors by the jury, they were entitled to overtime pay for hours worked over forty per week. Answering many phone calls night after night and completing sales from home qualifies as work that the defendants knew employees were engaging in, and that they should have been compensated for. *Holfpazel,* 145 F.3d at 522 ("Work need not be performed during scheduled on-duty hours for an employee to receive compensation.").

### G. Compensation for On-Call or Wait Time

A complicated and evolving question of law is whether Leevson and Tsigel should have been compensated in overtime for their time spent at home "on-call," or "waiting" to be engaged. Courts have traditionally frowned on rewarding plaintiffs overtime for time spent merely waiting to receive a call. *See Rutlin v. Prime Succession, Inc.*, 220 F.3d 737, 744 (6th Cir. 2000) (finding "time spent on call," or waiting to receive calls was not "so onerous as to require compensation. Rutlin was free to use that time for personal pursuits"). But that approach is yielding with the changing nature of home employment and new technology affecting the labor laws. *See* Department of Labor Request for Information, *Hours Worked Under the Fair Labor Standards Act*, Update 2017, RIN: 1235-AA12 ("Request for Information . . . about employees' use of electronic devices to perform work outside of regularly scheduled work hours and away from the workplace, as well as information regarding 'last minute' scheduling practices being utilized by some employers that are made possible . . . by employees' use of these devices.").

Jurors are increasingly aware of the strictures placed on "free-time" by the widespread evolving conditions of work:

> With technology now allowing connectivity twenty-four hours a day, more and more employees are using smartphones to answer work related phone calls and e-mails after work. This phenomenon has led to a recent wave of wage-and-hour litigation, with employees claiming overtime compensation for all the hours they have spent answering phone calls or checking e-mails on their smartphones while off-the-clock.

Maria L. Barbu, *The Ubiquitous Blackberry: The New Overtime Liability*, 5 Liberty U.L. Rev. 47, 47–49 (2010).

This is transformation is especially relevant to the analysis of "on-call" employees:

> [C]onsidering an on-call employee's efforts, classifying time as leisure, and thus non-compensable, fails to equitably account for the burdens imposed on the worker and the concomitant benefits that flow to the employer. In this situation, the employer receives the windfall in that he receives the benefit of having a

worker on-call without having to tender any compensation for having received this benefit.

Loren Schwartz, *Reforming the Fair Labor Standards Act: Recognizing on-Call Time As A Distinct Category of Compensable Work*, 40 U.S.F. L. Rev. 217, 221–23 (2005).

Following the court's definition of "hours worked," agreed upon by the parties, the jury found that Leevson and Tsigel both worked over forty hours per week. Although some of these overtime hours occurred at the work place, the jury also found, as evidenced by the additional jury question provided by the court, and agreed to by the parties, that when Leevson and Tsigel were at home, they were "impeded from going about their normal routine in their non-work life," by the necessity of their assigned work. *See* App. D, Additional Jury Question.

This finding of the jury is consistent with the testimony of Leevson and Tsigel that when they left the office they continued to be "on-call," and were required to answer phone calls from technicians and complete sales, preventing them from going about their normal non-work routines. The evidence supports the jury finding on this matter.

## V.     Damages

### A.  Breach of Contract

The evidence demonstrated, and the jury could reasonably find, that the plaintiffs assented to the terms of their contract, as it was applied and performed. They are not entitled to recover for unpaid wages or commissions.

### B.  FLSA and NYLL

The jury's verdict under the FLSA and the NYLL was supported by the evidence. The defendants are liable for the jury's verdict of damages for overtime pay, wage and statement notice penalties, and liquidated damages for willfulness.

### C.  Liquidated Damages

Under the NYLL, the plaintiffs are entitled to an additional 25% of their damages as liquidated damages up to April 9, 2011, and 100% of their damages as liquidated damages for the time after April 9, 2011.

Damages are awarded under the NYLL, because they provide the greater relief. *See Wicaksono v. XYZ 48 Corp.,* 2011 WL2022644, at *3 (S.D.N.Y. 2011) ([T]o the extent plaintiffs' allegations allow for recovery under both state and federal law, the law providing the greatest recovery will govern the calculation of damages.").

Leevson is entitled to 100% of her damages as liquidated damages, for a total of $25,680.54.

Tsigel is awarded 25% of her damages prior to April 9, 2011, for a total of $7,127.26, and 100% after April 9, 2011, for a total of $19,811.38.

### D. Pre-Judgment Interest

The court awards interest from a "single reasonable intermediate date"; in this case, the median date between the earliest ascertainable date the cause of action existed and the date the action was filed. *Gunawan,* 897 F. Supp. 2d at 93.

For Leevson, this date is March 28, 2013 (calculating the median of August 1, 2011, to November 24, 2014). For Tsigel, this date is November 24, 2011 (calculating the median of November 24, 2008, to November 24, 2014).

Interest is awarded from the date of verdict, August 29, 2017, to the date of judgment, November 1, 2017. New York CPLR § 5002 reads: "Interest shall be recovered upon the total sum awarded, including interest to verdict, report or decision . . . from the date the verdict was rendered or the report or decision was made to the date of entry of final judgment."

Pre-judgment interest is awarded on the unpaid overtime of $25,680.54 for Leevson and $48,320.45 for Tsigel. N.Y. CPLR § 5001.

### 1. Leevson's Interest

Leevson's interest is calculated from a principal amount of $25,680.54 owed for overtime pay. She is entitled to a simple 9% pre-judgment interest from March 28, 2013, to August 29, 2017 (1615 days or 4.42 years). Interest will be awarded at 9%, on the principal plus interest to verdict, from August 29, 2017, to November 1, 2017 (63 days or .17 years).

Defendants owe Leevson interest of $10,215.71 ($25,680.54 x 4.424 x 9%) from March 28, 2013, to August 29, 2017, and $549.21 ($35,896.25 x .17 x 9%) from August 29, 2017, to November 1, 2017.

### 2. Tsigel's Interest

Tsigel's interest is calculated from a principal amount of $48,320.45 owed for overtime pay. Tsigel is entitled to 9% pre-judgment interest from November 24, 2011, to August 29, 2017 (2105 days or 5.76 years). Interest will be awarded at 9%, on the principal plus interest to verdict, from August 29, 2017, to November 1, 2017 (63 days or .17 years).

Defendants owe Tsigel interest of $25,049.36 ($48,320.45 x 5.76 x 9%) from November 24, 2011, to August 29, 2017, and $1122.55 ($73,369.81 x .17 x 9%) from August 29, 2017, to November 1, 2017.

### E. Post-Judgment Interest

Plaintiffs are entitled to post-judgment interest to be calculated from the date of judgment, November 1, 2017, until the date of payment, using the rate set forth in Title 28 U.S.C. § 1961.

### F. Costs

Costs are denied to both parties.

Each party prevailed on a number of claims. The court finds that the "degree of success" was relatively equal and therefore assignment of costs is inappropriate. *Barfield,* 537 F.3d 132, 152.

### G. Attorney's Fees

The court calculates attorney's fees by multiplying a reasonable number of hours worked by a reasonable hourly rate. Plaintiffs' attorney, Svetlana Sobel, claims to have worked 536.25 hours which she bills at a rate of $400 per hour, for a total of $214,500. She claims 129 hours of "travel time" throughout the case which she bills at $200 per hour, for a total of $25,800.

Her co-counsel, David A. Feinerman, who assisted only at the trial, claims 54 hours at $350.00 per hour, for a total of $18,900. Plaintiffs' paralegal claims 139 hours at $150 per hour, for a total of $20,400.

The court has considered plaintiffs' affirmation in support of attorney's fees and finds that plaintiffs' hours and rate are reasonable, but must be reduced to reflect plaintiffs' degree of success. Because the FLSA claims comprised roughly half of plaintiffs' counsels' work in this case, the fees are reduced by one-half. Plaintiffs' attorney, Svetlana Sobel, is entitled to $107,250 in attorney's fees and $12,900 in "travel time." Her co-counsel is awarded $9,450 and her paralegal $10,200. The total award of attorney's fees is $139,800.

### H. Damages Chart

| | Overtime | Interest | Overtime + Interest | Wage Statement | Wage Notice | Liquidated | Total |
|---|---|---|---|---|---|---|---|
| Leevson<br><br>8/1/11-<br>7/23/12 | 25,680.54 | 3/28/13-<br>8/29/17=<br>10,215.71<br><br>8/29/17-<br>11/1/17=<br>549.21 | 25,680.54 +<br>10,215.71<br>+ 549.21 =<br>36,445.46 | 2,500 | 2,500 | 25,680.54 | $67,126 |

| Tsigel<br><br>11/24/08-11/9/12 | 48,320.45 | 11/24/11-8/29/17=<br>25,049.36<br><br>8/29/17-11/1/17=<br>1122.55 | 48,320.45 +<br>25,049.36<br>+ 1122.55<br>= 74,492.36 | 2,500 | 2,500 | 11/24/08-4/9/11=<br>7,127.26<br><br>4/9/11-11/9/12=<br>19,811.38 | $106,431 |
| --- | --- | --- | --- | --- | --- | --- | --- |

## VI.　　Summation of Rulings on Jury Verdict Findings

The rulings below correspond to the jury's findings as stated in the verdict sheet.

*See* App. E.

### I. Breach of Contract

A. Affirmed as consistent with the evidence; the jury finding that an agreement existed between all plaintiffs and all defendants.

B. Affirmed as consistent with the evidence; the jury finding that plaintiffs performed their obligations under the contract.

C. Reversed and set aside as inconsistent with the evidence; the jury finding that defendants did not pay plaintiffs in accordance with the agreement.

D. Reversed and set aside as inconsistent with the evidence; the jury finding that plaintiffs were owed unpaid commissions and hourly compensation.

### II. Fair Labor Standards Act & New York Labor Law

i.A. Affirmed as consistent with the evidence; the jury finding that Katherine Tsigel and Victoria Leevson were each employees of each defendant.

ii.A. Affirmed as consistent with the evidence; the jury finding that Katherine Tsigel and Victoria Leevson were to be compensated at $10 per hour, and in Tsigel's case $11 per hour for a period, by the defendants.

ii.B. Affirmed as consistent with the evidence; the jury finding that Katherine Tsigel and Victoria Leevson each worked in excess of forty hours per week.

iii.A. Affirmed as consistent with the evidence; the jury finding that defendants failed to provide annual wage notices.

iii.B. Affirmed as consistent with the evidence; the jury finding that defendants failed to provide wage statements at each pay period.

## III. Defendants' Defenses Under the FLSA and NYLL

i.A. Affirmed as consistent with the evidence; the jury finding that Katherine Tsigel and Victoria Leevson did not work as independent contractors.

ii.A Affirmed as consistent with the evidence; the jury finding that Katherine Tsigel and Victoria Leevson were not highly compensated employees.

iii.A. Affirmed as consistent with the evidence; the jury finding that Katherine Tsigel and Victoria Leevson were not outside salespeople.

iv.A. Affirmed as consistent with the evidence; the jury finding that Katherine Tsigel and Victoria Leevson were not inside salespeople.

v. Reversed as inconsistent with the evidence; the jury finding that the defendants proved estoppel—to the extent that estoppel prevents a finding that the plaintiffs were employees—we agree with the jury that it does not.

## IV. Damages

A. Reversed as inconsistent with the evidence; the jury award of damages for breach of contract.

B. Affirmed as consistent with the evidence; the jury finding of hours worked per week and time period by Katherine Tsigel and Victoria Leevson.

A. Affirmed as consistent with the evidence; the jury finding that Katherine Tsigel and Victoria Leevson were not paid proper wages.

B. Affirmed as consistent with the evidence; the jury finding that failure to pay was willful.

C. Affirmed as consistent with the evidence; the jury finding that Katherine Tsigel and Victoria Leevson were not paid overtime.

D. Affirmed as consistent with the evidence; the jury finding that failure to pay was willful.

E. Affirmed as consistent with the evidence; the jury finding that Katherine Tsigel and Victoria Leevson are owed nothing for unpaid regular wages.

F. Affirmed as consistent with the evidence; the jury award to Victoria Leevson for unpaid overtime.

G. Affirmed as consistent with the evidence; the jury award to Katherine Tsigel for unpaid overtime.

## VII.    Conclusion

Judgment shall be entered on November 1, 2017: (1) in favor of Katherine Tsigel for the sum of $106,431 against each defendant jointly and severally; and (2) in favor of Victoria Leevson in the sum of $67,126 against each defendant jointly and severally.

Plaintiffs Katherine Tsigel and Victoria Leevson have agreed to pay all attorney's fees awarded them to their counsel, Svetlana Sobel.  Judgment shall be entered in favor of Svetlana Sobel in the sum of $139,800 against each defendant jointly and severally.

SO ORDERED.

/s/ Jack B. Weinstein

Jack B. Weinstein
Senior United States District Judge

Dated:  November 1, 2017
        Brooklyn, New York